# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *In re Detention of Stanbridge*, 2012 IL 112337

---

| | |
|---|---|
| Caption in Supreme Court: | *In re* DETENTION OF STANBRIDGE (The People of the State of Illinois, Appellant, v. Kevin Stanbridge, Appellee).—*In re* DETENTION OF LIEBERMAN (The People of the State of Illinois, Appellee, v. Brad Lieberman, Appellant). |
| Docket Nos. | 112337, 112802 cons. |
| Filed | November 29, 2012 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | One petitioning for discharge or conditional release from civil commitment as sexually violent bears the burden of presenting a plausible account as to each required petition element so as to show a change in the circumstances which led to the initial commitment—probable cause standard. |
| Decision Under Review | No. 112337—Appeal from the Appellate Court for the Fourth District; heard in that court on appeal from the Circuit Court of Adams County, the Hon. William O. Mays, Judge, presiding.<br><br>No. 112802—Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Dennis J. Porter, Judge, presiding. |

| | |
|---|---|
| Judgment | No. 112337—Appellate court judgment reversed.<br>Circuit court judgment affirmed.<br>No. 112802—Affirmed. |
| Counsel on<br>Appeal | No. 112337—Lisa Madigan, Attorney General, of Springfield (Michael A. Scodro, Solicitor General, and Michael M. Glick, Sheri L. Wong and Davis H. Iskowich, Assistant Attorneys General, of Chicago, of counsel), for the People.<br><br>Betsy Bier, of Bier & Bier, of Quincy, for appellee.<br><br>No. 112802—Kimball R. Anderson, Anthony D. Pesce, Daniel Braun and Laura Whitney Lee, of Winston & Strawn LLP, of Chicago, for appellant.<br><br>Lisa Madigan, Attorney General, of Springfield (Michael A. Scodro, Solicitor General, and Michael M. Glick and David H. Iskowich, Assistant Attorneys General, of Chicago, of counsel), for the People. |
| Justices | JUSTICE THEIS delivered the judgment of the court, with opinion.<br>Chief Justice Kilbride and Justices Freeman, Thomas, Garman, Karmeier, and Burke concurred in the judgment and opinion. |

## OPINION

¶ 1 In these consolidated appeals, we are asked to clarify the quantum and scope of evidence needed to establish probable cause in a postcommitment discharge or conditional release proceeding pursuant to the Sexually Violent Persons Commitment Act (725 ILCS 207/1 *et seq.* (West 2008)). In both cases, the trial court found a lack of probable cause and dismissed the individual petitions for discharge or conditional release. In *Stanbridge*, the appellate court reversed, finding that the trial court improperly weighed contradictory evidence of the parties' respective experts. *Stanbridge*, 408 Ill. App. 3d 553. In *Lieberman*, the appellate court affirmed, over a dissent, finding that the expert did not present sufficient evidence on the relevant statutory elements to warrant a further hearing and did not comply with the statutory requirements for conditional discharge. *Lieberman*, 2011 IL App (1st) 090796.

¶ 2 We allowed petitions for leave to appeal in both cases (Ill. S. Ct. R. 315 (eff. Feb. 26, 2010)) and consolidated the appeals for review. For the following reasons, we reverse the appellate court judgment in *Stanbridge* and affirm the appellate court judgment in *Lieberman*.

## I. BACKGROUND

### A. No. 112337, Kevin Stanbridge

The history of Kevin Stanbridge's civil commitment is detailed in the appellate court opinion. We will repeat here only those facts necessary to our analysis. Following a jury trial in 2005, Stanbridge was convicted of aggravated criminal sexual abuse (720 ILCS 5/12-16(d) (West 1998)), and his conviction was affirmed on direct appeal. *People v. Stanbridge*, No. 4-05-0585 (2007) (unpublished order under Supreme Court Rule 23).

In May 2005, during the pendency of Stanbridge's appeal, the State filed a petition to involuntarily commit him as a sexually violent person under the Sexually Violent Persons Commitment Act (the Act) (725 ILCS 207/1 *et seq.* (West 2004)). Following a trial on the State's petition, in October 2007, a jury found Stanbridge to be a sexually violent person as defined by section 5(f) of the Act (725 ILCS 207/5(f) (West 2004)). Thereafter, in February 2008, the trial court ordered him committed to a secure facility for institutional care and treatment until such time as he is no longer a sexually violent person. His commitment was affirmed on direct appeal. *In re Kevin S.*, No. 4-08-0163 (2008) (unpublished order under Supreme Court Rule 23).

Within six months after his initial commitment, the Department of Human Services (Department) submitted its required evaluation report to the court on Stanbridge's mental condition to determine whether he had made sufficient progress to be conditionally released or discharged pursuant to section 55 of the Act (725 ILCS 207/55 (West 2008)). The report was prepared by Dr. Edward Smith. Stanbridge did not retain or request that the court appoint an expert to examine him at that time. He did not file a petition for discharge, but did not affirmatively waive his right to do so under the Act. Accordingly, the State then filed a motion for a finding of no probable cause based on Dr. Smith's evaluation report. On October 31, 2008, the trial court granted the State's motion, finding that no probable cause existed to warrant a hearing on the matter.

In March 2009, Stanbridge filed a petition for discharge under section 70 of the Act (725 ILCS 207/70 (West 2008)), which did not coincide with the periodic-evaluation process. The trial court appointed clinical and forensic psychologist Dr. Kirk Witherspoon to evaluate Stanbridge's mental condition to determine whether he was still a sexually violent person. Dr. Witherspoon submitted his amended psychological evaluation report to the court in January 2010.

While Stanbridge's petition for discharge was pending, in August 2009, the Department submitted its required periodic-reexamination report on Stanbridge's mental condition, which was conducted again by Dr. Smith. The State again filed a motion for a finding of no probable cause, attaching Dr. Smith's written report in support of the motion.

In January 2010, by agreement of the parties, the trial court held a joint probable cause hearing on both Stanbridge's petition for discharge and the State's motion for a finding of no probable cause based on the periodic reexamination. At the hearing, the court considered the two psychological evaluation reports submitted by Drs. Smith and Witherspoon and heard arguments of counsel.

Dr. Witherspoon's report indicated that his evaluation was based primarily upon his

interview with Stanbridge, a review of Stanbridge's prior psychological evaluations, and various diagnostic tests designed to measure deviant sexual attitudes and behavior and to predict sexual offense recidivism rates. Based on this information, and consistent with his prior findings, Dr. Witherspoon's clinical impression was that Stanbridge's test results did not reveal ongoing evidence of deviant sexual psychopathology of any form and did not evince historic or current antisocial tendencies.

¶ 12        In determining Stanbridge's risk of reoffending, Dr. Witherspoon administered several actuarial assessment instruments, including the Static 2002R. He indicated this test was a revised version of the Static 99, which provides a more accurate measure of risk by better accounting for risk decline due to age and by providing more current demographic trends. Dr. Witherspoon stated that Stanbridge's scores showed that his antisocial tendencies were akin to that of average nonincarcerated males, and placed Stanbridge in a low relative sexual reoffense risk in comparison to other convicted sexual offenders. Dr. Witherspoon's opinion that Stanbridge's risk of reoffense was low was also based on other factors, including Stanbridge's age and his denial that he committed the offenses for which he was convicted. Dr. Witherspoon based his opinion on research showing that all forms of criminality decrease with advancing age, and that denial of sex crimes against minors is not a universally negative indicator relative to the risk of reoffending. In conclusion, Dr. Witherspoon's opinion was that Stanbridge did not meet the diagnostic criteria minimally necessary for involuntary commitment under the Act and that his risk of reoffending was not in the range necessary for such commitment.

¶ 13        Dr. Smith's evaluation was based on Stanbridge's Department records, a peer consultation and his prior six-month psychological examination. In Dr. Smith's report, he noted that Stanbridge declined to participate in the reexamination. Dr. Smith recounted Stanbridge's criminal and sexual offense history, including charges, convictions and other allegations of sexual offenses. He also recounted his personal history, education and employment, and his history of mental health and medical treatment, substance abuse, behavioral tendencies, and treatment. Dr. Smith concluded that Stanbridge met the criteria for the following diagnoses based on the guidelines in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (DSM-IV-TR): "(1) Paraphilia, not otherwise specified, sexually attracted to adolescent males, nonexclusive type; (2) alcohol abuse in a controlled environment; (3) personality disorder, not otherwise specified, with antisocial traits; and (4) rule out pedophelia, sexually attracted to males, nonexclusive type."

¶ 14        In considering Stanbridge's risk of reoffending, Dr. Smith conducted two assessments not administered by Dr. Witherspoon, namely, the Static 99 and the Minnesota Sex Offender Screening Tool-Revised. Based on these assessments, Dr. Smith placed Stanbridge in the moderate to high category of recidivism risk on one assessment and in the high-risk category on the other assessment. Dr. Smith also considered other empirical risk factors based on scientific research that would likely contribute to Stanbridge's risk of reoffense, and concluded that he met those aggravating risk factors due to his personality disorder, substance abuse, intoxication during the offense, intimate relationship conflicts, and deviant sexual interest.

¶ 15        Dr. Smith also considered factors that might lower one's risk of sexual recidivism,

including sex-offense-specific treatment, a serious and debilitating medical condition, and increased age. According to Dr. Smith, no medical issues warranted a decreased risk, and treatment-based risk reduction was not warranted because Stanbridge refused treatment. Additionally, because the research indicated no universal agreement on how age impacts recidivism rates, Dr. Smith opined that some age-based risk reduction was present, but that age was not currently a protective factor for Stanbridge. Accordingly, Smith concluded that a substantial probability existed that Stanbridge would engage in further acts of sexual violence due to his mental disorders.

¶ 16    After considering the expert reports and the parties' arguments, the trial court made the following findings:

> "[T]he court found [respondent] to be a sexually violent person[—]had the appropriate diagnosis and findings [in February 2008]. [The court does not] see where the [State's] expert, *** Smith, has found that there is anything different than that, based on what has occurred between now and the time of the original finding.
>
> Witherspoon, if [the court] remembers correctly, came up with many of the same conclusions at the time of the original hearing, and that's in fact what was determined by the jury. So it seems to [this court that] at this point[,] there is no probable cause to proceed with a full hearing on the matter, and the court would so rule."

The trial court denied Stanbridge's petition for discharge and granted the State's motion for a finding of no probable cause. The court order indicated that the court had considered both evaluations prepared by Drs. Smith and Witherspoon, but found that based upon a review of the reports related to the 18-month reevaluation of respondent, no probable cause existed to warrant further proceedings to determine whether respondent remained a sexually violent person.

¶ 17    On appeal, Stanbridge argued that the trial court improperly weighed the conflicting testimony of the parties' respective experts instead of determining whether the evidence presented established probable cause to warrant further proceedings. 408 Ill. App. 3d at 558. The appellate court agreed and reversed and remanded for further proceedings, concluding that the evidence presented was sufficient to establish probable cause. *Id.* at 563. We granted the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010).


¶ 18                              B. No. 112803, Brad Lieberman

¶ 19    The history of Brad Lieberman's commitment relevant to this appeal is detailed in the appellate court opinion and will be recounted here to the extent necessary to our disposition. In 1980, Lieberman was convicted of numerous counts of rape and sentenced to multiple concurrent terms of imprisonment. Shortly before his scheduled release date from prison in 2000, the State sought to have Lieberman involuntarily committed as a sexually violent person pursuant to the Act (725 ILCS 207/1 *et seq.* (West 2000)).

¶ 20    In February 2006, a jury found Lieberman to be a sexually violent person within the meaning of the Act. The mental disorders that formed the basis for Lieberman's commitment included paraphilia, not otherwise specified, sexually attracted to nonconsenting persons (paraphilia NOS-nonconsent). The State's experts described this type of disorder as one

premised on intense recurring rape behaviors with nonconsenting adults that cause distress or impair one's ability to function in society. Thereafter, in April 2006, the trial court ordered Lieberman committed to the Department for institutional care and treatment in a secure facility until further order of the court.

¶ 21 Lieberman appealed, arguing, *inter alia*, that the State failed to prove that he suffers from a serious lack of volitional control resulting from a current mental disorder, and failed to prove beyond a reasonable doubt that he suffers from a mental disorder or that he presents any risk to reoffend. *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 597-98 (2007). Specifically, he maintained that the State's expert's opinions and diagnoses did not meet the diagnostic criteria of the Diagnostic and Statistical Manual of Mental Disorders (DSM). *Id.* at 602. His commitment was affirmed on direct appeal. *Id.* at 611.

¶ 22 The record reflects that in October 2006, the Department conducted its mandated six-month reexamination to determine whether Lieberman had made sufficient progress to be conditionally released or discharged. In conjunction with the mandated six-month reexamination, Lieberman filed a petition for discharge or conditional release, which the court denied in December 2006. The following year, in October 2007, Dr. David Suire, an evaluator with the Department, conducted Lieberman's mandated periodic psychological reexamination to again determine whether Lieberman had made sufficient progress to be conditionally released or discharged. Dr. Suire reported that in his clinical judgment Lieberman continued to suffer from paraphilia NOS-nonconsent, cannabis abuse, antisocial personality disorder, and narcissistic personality disorder. He believed it was substantially probable that Lieberman would engage in future acts of sexual violence. He also noted that Lieberman had not participated in any core sex-offender treatment offered by the Department.

¶ 23 In conjunction with this annual reevaluation, the State filed a motion for a finding of no probable cause. Lieberman did not affirmatively waive his right to petition for discharge and, simultaneously with the State's motion, exercised his right to file a petition for discharge under section 65(b)(1) of the Act (725 ILCS 207/65(b)(1) (West 2006)). Thereafter, the court granted Lieberman leave to amend his petition to alternatively petition for conditional release under section 60(c) of the Act (725 ILCS 207/60(c) (West 2006)). The court appointed Dr. Eric Ostrov to conduct an evaluation of Lieberman under this section. The court also granted Lieberman's motion to allow Dr. Chester Schmidt to perform an independent examination of him.

¶ 24 The following testimony was presented by Dr. Schmidt at the probable cause hearing on the petition for discharge or alternatively conditional release. Dr. Schmidt testified that he was a physician psychiatrist, a professor of psychiatry at Johns Hopkins University School of Medicine, and founder and member of the sexual behavior consultation unit at Johns Hopkins Hospital. Dr. Schmidt rendered two opinions: (1) the diagnosis of paraphilia NOS-nonconsent does not exist in the DSM; and (2) Lieberman does not have a paraphilia.

¶ 25 With respect to the first opinion, Dr. Schmidt explained that the DSM identifies a general class of disorders called "paraphilias," which the DSM defines as having the following essential diagnostic features: "recurrent, intense sexually arousing fantasies, sexual urges,

or behaviors generally involving *** nonconsenting persons that occur over a period of at least 6 months."[1]

¶ 26     Dr. Schmidt explained that the DSM specifically identifies nine common paraphilic conditions and lists the diagnostic criteria for each condition. In addition, the DSM includes a residual category of "paraphilia not otherwise specified" for paraphilias that do not meet the criteria for any of the nine specifically listed categories. That residual section provides a nonexhaustive list of examples that fall under this catch-all NOS category. Dr. Schmidt testified that paraphilia NOS-nonconsent is not contained within either the section that lists the nine common paraphilic conditions or within the examples listed in the residual NOS category.

¶ 27     Dr. Schmidt acknowledged that there are those in the profession that believe paraphilia NOS-nonconsent is a valid disorder that falls under the catch-all NOS category, and that they apply the general diagnostic features of paraphilias to diagnose this particular rape-related paraphilia. However, Dr. Schmidt disagreed with this approach and disagreed that the DSM-IV contains a mental disorder known as paraphilia NOS-nonconsent without the proper formal vetting of that diagnosis.

¶ 28     Dr. Schmidt explained that there is a formal process by which diagnoses are included in the DSM. In 1986, he was the chairman of a committee convened by the American Psychiatric Association (APA) to consider whether to include a diagnosis for paraphilia NOS-nonconsent in the DSM-III-R. The committee voted against inclusion of a rape-related paraphilia diagnosis for two reasons: (1) there was "no scientific support for the diagnosis"; it was based solely on "expert opinion which is one of the lowest forms of research to support anything"; and (2) there were numerous organizations within the legal, social work, and psychiatric communities that voiced concern that the diagnosis would be misused to create an insanity defense in rape trials. As a result, the board of trustees of the APA, of which Dr. Schmidt was also a member, voted to exclude the diagnosis in the DSM-III-R.

¶ 29     During his later work as chairman between 1995 and 2000 on the revision of the DSM-III-R to the DSM-IV, there were no requests that the disorder be included in the new edition. To Dr. Schmidt's knowledge there is no current reconsideration of that decision, which in his opinion means that "the field in general is essentially satisfied with the *** diagnostic format that exists within the DSM-IV." It was his opinion that the use of officially recognized diagnoses in the DSM is essential for purposes of patient care, valid research and the integrity of the legal system, and failure to adhere to it may have an impact on the treatment process.

¶ 30     On cross-examination, Dr. Schmidt recognized that the diagnosis of paraphilia NOS-nonconsent is widely accepted by forensic experts in the medical field, and that the debate regarding the use of this diagnosis has been ongoing for about 20 years. He also

---

[1]This section of the DSM also identifies additional diagnostic features for some paraphilias which can include a requirement that "the behavior, sexual urges, or fantasies cause clinically significant distress or impairment in social, occupational, or other important areas of functioning." DSM at 566.

acknowledged that Lieberman's experts did not raise this issue at his original commitment trial.

¶ 31    Dr. Schmidt further testified regarding the bases for his conclusion that Lieberman does not suffer from a paraphilia, assuming the diagnosis exists. In preparing his opinions, Dr. Schmidt relied upon Lieberman's Department of Corrections (DOC) mental health reports, his Department master treatment plans, police reports, articles on civil commitment and the diagnosis of paraphilia, the transcript from Lieberman's 2006 commitment trial, expert evaluations from other evaluators, including Dr. Jacqueline Buck, Dr. Barry Leavitt, Dr. Suire, Dr. Ostrov, and an interview with Lieberman in April 2008.

¶ 32    Dr. Schmidt considered that in the 15 evaluations done of Lieberman during his 20 years in the DOC, he was never diagnosed with paraphilia, and that the evaluators were required to record that diagnosis if in fact it existed. In considering Lieberman's psychosexual history prior to 1979, when he committed the rapes, Dr. Schmidt testified that his opinion that Lieberman had a "fairly normal heterosexual development during his teen years and adolescent years" was reasonably consistent with the other evaluations. Dr. Schmidt was of the opinion that Lieberman has had no paraphilic fantasies or urges in the past 29 years based upon Lieberman's own self-reporting.

¶ 33    With respect to paraphilic behavior, Dr. Schmidt found that there were no reported behaviors of any coercive sexual activity with either female staff or prisoners. It was his opinion that Lieberman would have found an outlet to act out his paraphilia, including with the prison's homosexual community even though he was otherwise heterosexual. One who has a paraphilia would have a heightened degree of impulsivity that is sexually driven and compulsive, and one would expect that even in an incarcerated situation that such a person could find outlets to act out the paraphilia. One would expect that in over 29 years of incarceration there would be some evidence of attempts to act out the behavior and that the acting out would have caused some difficulty.

¶ 34    Dr. Schmidt also based his opinion that Lieberman did not suffer from a paraphilia on the Global Assessment of Functioning (GAF) scale, as determined by his treatment team. The scale measures a person's symptom severity and level of functioning. Assuming Lieberman had a paraphilia, Dr. Schmidt believed that one could measure change in Lieberman's symptom severity by looking at his GAF scores over time. Lieberman's GAF scores from 1999 to 2005 were in the range of 45, which indicated serious symptoms or impairment. His most recent score of 71 indicated, according to the DSM, that symptoms are present, but that they are "transient and expect[ed] reactions to psycho-social stressors," and that Lieberman has "no more than slight impairment in social, occupation, or school functioning." Dr. Schmidt testified that Lieberman's score indicated that those who have observed and scored Lieberman believe that his symptoms and functional capacity have dramatically improved. However, Dr. Schmidt acknowledged on cross-examination that he did not speak to anyone at the Department as to how they use those scores.

¶ 35    Dr. Schmidt was asked to explain how Lieberman could have committed the numerous rapes in 1979 but for the fact that he was driven by some type of mental disorder. Dr. Schmidt testified that rape is not a mental disorder, nor is it necessarily paraphilic. Less than

10% of rapists suffer from a paraphilia. Additionally, Dr. Schmidt believed that Lieberman's immediate prerape history may be relevant to explaining his multiple rapes. According to the materials Dr. Schmidt reviewed, Lieberman reported a sexual experience in which a woman that he was attempting to have intercourse with "initially resisted, resisted, and then allowed, then said yes." Lieberman reported this as being very important because it led him to believe when he was 19 that "when women said no they really meant yes." He reports that his first rape was "very sexually gratifying," and that "motivated him to engage further." At that time he had "absolutely no regard for the law" and was "acting selfishly for his own sexual gratification." When Lieberman was apprehended and then released on bond, he committed the additional rapes because he thought "the law had no teeth," and that he was "immune" from it. Dr. Schmidt believed that these experiences provided "as plausible an explanation as maybe we'll ever get from the facts of the case."

¶ 36    On cross-examination, Dr. Schmidt testified that he is not a member of any professional organization focusing on the evaluation and treatment of sexual offenders and has never been previously qualified as an expert in a sexually violent person's commitment proceeding. He has never evaluated a person who has been found to be a sexually violent person by the laws of the state, but has evaluated and treated convicted sex offenders. With regard to the records he reviewed, he stated that he did not review the trial transcripts or police reports from the trials resulting in Lieberman's rape convictions. Other than the mental health records from the DOC, Dr. Schmidt did not review any other documents in the DOC file regarding Lieberman's behavior.

¶ 37    The parties stipulated that Dr. Mark Babula would testify that he was Lieberman's primary therapist at the treatment facility. Any contact he had with Lieberman did not constitute sexual offender treatment. Dr. Babula would further testify that Lieberman has not participated in any sexual offender treatment at the facility.

¶ 38    The court-appointed expert, Dr. Ostrov, testified that he diagnosed Lieberman based upon the DSM with paraphilia NOS-nonconsent and a personality disorder with antisocial and narcissistic features. It was his opinion that these disorders predispose Lieberman to commit future acts of sexual violence and, therefore, Dr. Ostrov did not recommend conditional release.

¶ 39    Dr. Ostrov testified that his diagnosis of paraphilia was informed by guidance from the DSM general criteria for paraphilias, including recurrent and intense sexual behaviors over a period of six months that caused clinically significant distress or impairment in social, occupational, or other important areas of functioning. Dr. Ostrov further testified that his diagnosis was based upon several aspects of Lieberman's behavior. Based upon his review of the relevant materials, Lieberman evinced repeated instances of nonconsensual sex directed at different women over a period of more than six months which caused him clinically significant distress and impairment in functioning. Lieberman's actions were "driven behavior" in that "despite his fear, the drivenness overcame that fear" and led him to commit the numerous rapes. Dr. Ostrov found Lieberman evinced a lack of empathy for his victims, and explained that Lieberman's claim that he has not "acted out sexually" during his detention must be viewed with the understanding that he has not been around his preferred sexual stimuli.

¶ 40      Dr. Ostrov further testified that Lieberman's results on various diagnostic tools indicated that he posed a high risk of reoffending. Dr. Ostrov believed that Lieberman's failure to participate in sex-offender treatment contributed to his high risk because he has not shown an interest in and has not had the benefit of completing formal sexual offender treatment, which has been empirically shown to decrease the risk of reoffending. Dr. Ostrov believed that other dynamic factors such as age would have some impact on Lieberman's likelihood of recidivism, but not a very significant impact. Dr. Ostrov did not find evidence that Lieberman had significantly decreased the risk that he would sexually reoffend.

¶ 41      Dr. Suire testified that he diagnosed Lieberman using the DSM criteria with paraphilia NOS-nonconsent, cannabis abuse, antisocial personality disorder, and narcissistic personality disorder. He acknowledged the disagreement regarding the diagnosis of paraphilia, but believed it was primarily due to "political factors" and the understanding that not all rapes are paraphilic. In diagnosing Lieberman, Dr. Suire considered the nature and pattern of the rapes, whether the behaviors were occurring while he had access to consenting partners, the frequency of the conduct, and whether he was committing other crimes at the same time.

¶ 42      Dr. Suire further testified regarding Lieberman's risk assessment, relying on his file, and the use of actuarial instruments to achieve a "baseline estimate of the risk." Lieberman scored in the high-risk category on these tests. Additionally, Dr. Suire considered other aggravating and protective factors which could increase or decrease his risk levels. Lieberman had several aggravating factors, including deviant sexual arousal, two personality disorders, and high scores on other diagnostic tools, which correlate with an elevated risk. Dr. Suire did not consider Lieberman's age to be a significant protective factor, and noted that Lieberman did not participate in any core sex-offender treatment, which can substantially reduce his recidivism risk. Dr. Suire did not believe that Lieberman's risk was reduced by participation in "ancillary treatment-type" programs at the treatment facility. Accordingly, it was Dr. Suire's opinion that it was substantially probable that Lieberman would commit new acts of sexual violence and that he had not made sufficient progress to allow him to be safely managed in the community.

¶ 43      The trial court denied Lieberman's petition for discharge or conditional release. The court acknowledged the debate among mental health professionals as to the validity of the diagnosis of paraphilia NOS-nonconsent, but found the question could not be answered simply by testimony that the disorder is not specifically listed in the DSM. The court ultimately found it was a mental disorder that satisfied the requirements of the Act. The court further found Dr. Schmidt's explanation for why Lieberman may have committed the rapes to be absolutely lacking in credibility and found the State's experts to be credible. Although the court found that Lieberman had made some improvements, he also noted his refusal to participate in formal sex-offender treatment, claiming that he did not need it, and found that when viewed in totality, there was no probable cause to believe that Lieberman had made sufficient progress to be conditionally released or discharged.

¶ 44      On appeal, Lieberman contended that the denial of his petition was error and violated his right to due process. In its original decision, the appellate court found no error, finding that the trial court was "free to accept the opinion of one expert witness over another or accept part and reject part of each expert's testimony," and affirmed the trial court's judgment. *In*

*re Detention of Lieberman*, 401 Ill. App. 3d 903, 923 (2010). We subsequently directed the appellate court to vacate its judgment and to reconsider in light of *In re Detention of Hardin*, 238 Ill. 2d 33 (2010).

¶ 45       On remand, the appellate court concluded that a different result was not warranted after reviewing *Hardin* and, therefore, affirmed the circuit court's judgment. 2011 IL App (1st) 090796, ¶ 65. The majority found that the expert did not present sufficient evidence on the relevant statutory elements to warrant a further hearing and did not comply with the statutory requirements for conditional discharge. *Id*. Justice Garcia dissented with respect to the petition for conditional release. He believed that the decision in *Hardin* compelled the court to reverse the circuit court's finding on probable cause where the circuit court improperly based its ruling on a " 'full and independent evaluation of [Dr. Schmidt's] credibility and [his expert opinion].' " *Id*. ¶ 83 (Garcia, P.J., dissenting) (quoting *Hardin*, 238 Ill. 2d at 53). We allowed Lieberman's petition for leave to appeal and consolidated his appeal with Stanbridge's appeal.

¶ 46                                        II. ANALYSIS
¶ 47                   A. Overview of the Sexually Violent Persons Commitment Act
¶ 48       We begin our analysis with an overview of the Act. The Act authorizes the involuntary civil commitment of "sexually violent persons" for "control, care and treatment." 725 ILCS 207/40(a) (West 2008). The Act defines a "sexually violent person" as an individual who has "been convicted of a sexually violent offense" and who "is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2008). A "mental disorder" is defined under the Act as a "congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2008). If the State proves beyond a reasonable doubt that an individual is a sexually violent person, that individual may be indefinitely committed "until such time as the person is *no longer* a sexually violent person." (Emphasis added.) 725 ILCS 207/35(f), 40(a) (West 2008).

¶ 49       After an individual has been committed to institutional care under the Act, the Department is responsible for evaluating the individual's mental condition within six months of the initial commitment and again thereafter at least annually. 725 ILCS 207/55 (West 2008). The stated purpose of these periodic examinations is to determine "whether the person has made *sufficient progress* to be conditionally released or discharged." (Emphasis added.) 725 ILCS 207/55 (West 2008); *People v. Botruff*, 212 Ill. 2d 166, 171 (2004) (purpose of reexamination is to determine whether person has "progressed enough to be conditionally released or discharged").[2]

_____

[2]We note that since the relevant periodic evaluations in these consolidated cases, the legislature has amended this section to provide that the purpose of these evaluations is to determine "whether: (1) the person has made sufficient progress *in treatment* to be conditionally released and (2) whether the person's *condition has so changed* since the most recent periodic reexamination (or

¶ 50      Although commitment is potentially indefinite in nature, a committed individual may challenge his continued commitment under the Act through a petition for discharge or a petition for conditional release. A committed person may seek a discharge under three available mechanisms. The first mechanism applies if the Secretary of Human Services determines, at any time, that the individual is no longer a sexually violent person. In that case, the Secretary must authorize the committed individual to petition the court for discharge. 725 ILCS 207/65(a)(1) (West 2008).

¶ 51      The second mechanism for discharge is triggered whenever the committed individual undergoes one of the periodic examinations required by section 55 of the Act. At the time of each such examination, the committed person must be given written notice that he has the right to petition for discharge over the Secretary's objection. 725 ILCS 207/65(b)(1) (West 2008). If the committed individual does not affirmatively waive that right, the court must set a probable cause hearing to determine whether facts exist that warrant a hearing on whether the defendant is "still a sexually violent person." *Id*.[3] If the committed person does not file a petition for discharge, but nonetheless does not waive his right to do so, then the probable cause hearing consists only of a review of the reexamination reports and arguments of the parties. *Id*.

¶ 52      If the court finds that there is probable cause to believe that the committed individual "is no longer a sexually violent person," it must set a hearing on the issue and the State has the burden of proving by clear and convincing evidence that the committed individual is "still a sexually violent person." 725 ILCS 207/65(b)(2) (West 2008).[4]

¶ 53      In addition to these procedures, under a third mechanism, the committed individual may

---

initial commitment, if there has not yet been a periodic reexamination) that he or she is no longer a sexually violent person." (Emphases added.) Pub. Act 97-1075 (eff. Aug. 24, 2012) (amending 725 ILCS 207/55).

     [3]The amended statute currently provides that "the court shall set a probable cause hearing to determine whether facts exist to believe that since the most recent periodic reexamination (or initial commitment, if there has not yet been a periodic reexamination), the condition of the committed person has so changed that he or she is no longer a sexually violent person. However, if a person has previously filed a petition for discharge without the Secretary's approval and the court determined, either upon review of the petition or following a hearing, that the person's petition was frivolous or that the person was still a sexually violent person, then the court shall deny any subsequent petition under this Section without a hearing unless the petition contains facts upon which a court could reasonably find that the condition of the person had so changed that a hearing was warranted." Pub. Act 97-1075 (eff. Aug. 24, 2012) (amending 725 ILCS 207/65(b)(1)).

     [4]The amended statute currently provides that "[i]f the court determines at the probable cause hearing *** that probable cause exists to believe that since the most recent periodic reexamination (or initial commitment, if there has not yet been a periodic reexamination), the condition of the committed person has so changed that he or she is no longer a sexually violent person, then the court shall set a hearing on the issue." Pub. Act 97-1075 (eff. Aug. 24, 2012) (amending 725 ILCS 207/65(b)(2)).

-12-

petition for discharge at times other than the periodic examinations and may do so without the approval of the Secretary. 725 ILCS 207/70 (West 2008).[5] If the person has not previously filed a petition for discharge without the Secretary's approval, the court must set a probable cause hearing and, if appropriate, proceed in accordance with the same procedures governing unapproved petitions for review filed at the time of the statutorily mandated periodic examinations. *Id*. If, however, the person did previously file a petition for discharge without the Secretary's approval and the court determined, based on review of the petition or following a hearing, that the petition was frivolous or that the defendant was still a sexually violent person, then an important limitation applies to this section. The court is required to dismiss the petition without a hearing unless the petition contains facts that would support a finding that the defendant has so changed that a hearing is warranted. *Id*.

¶ 54       A committed individual may also petition the court to modify the commitment order by authorizing conditional release. The Department may recommend that a committed person is appropriate for conditional release at any time and file a petition on the person's behalf. 725 ILCS 207/60(a) (West 2008). Alternatively, if certain statutory requirements are met, the committed person may file a petition without the Department's approval. The trial court must hold a hearing to determine whether probable cause exists "to believe that it is not substantially probable that the person will engage in acts of sexual violence if on release or conditional release." 725 ILCS 207/60(c) (West 2008).[6] If the court finds probable cause, then it must hold an evidentiary hearing on the issue, and grant the petition unless the State shows by clear and convincing evidence that the person has not made sufficient progress to be conditionally released. 725 ILCS 207/60(d) (West 2008).[7]


¶ 55                               B. Applicable Standard of Proof

¶ 56       We are initially asked in these consolidated appeals to consider the proper standard for assessing the evidence at a postcommitment probable cause hearing on a petition for discharge or conditional release. Initially, we address whether the quantum of proof for probable cause in postcommitment proceedings is the same standard we adopted in *In re*

---

[5]The legislature has since repealed this section of the statute. Pub. Act 97-1075, § 10 (eff. Aug. 24, 2012).

[6]The amended statute currently provides that the court must determine whether there is "probable cause to believe the person has made sufficient progress *in treatment* to the point where he or she is no longer substantially probable to engage in acts of sexual violence if on conditional release." (Emphasis added.) Pub. Act 97-1075 (eff. Aug. 24, 2012) (amending 725 ILCS 207/60(c)). Additionally, "[t]he probable cause hearing shall consist of a review of the examining evaluators' reports and arguments on behalf of the parties." *Id.*

[7]The amended statute currently provides that the State must prove by clear and convincing evidence that "the person has not made sufficient progress *in treatment* to the point where he or she is no longer substantially probable to engage in acts of sexual violence if on conditional release." (Emphasis added.) Pub. Act 97-1075 (eff. Aug. 24, 2012) (amending 725 ILCS 207/60(d)).

*Detention of Hardin*, 238 Ill. 2d 33 (2010). The resolution of this question involves a legal issue to be reviewed *de novo*. *Id.* at 44.

¶ 57 In *Hardin*, this court considered the quantum of evidence needed to support a finding of probable cause to believe that a person is a sexually violent person under the Act. *Id*. In establishing the appropriate standard, this court rejected the respondent's argument that a reasonable doubt standard was proper. Rather, this court gave the term "probable cause" its ordinary and popularly understood meaning. *Id.* at 48. In doing so, we looked to the concepts applicable to probable cause determinations in the criminal context. We ultimately adopted the evidentiary standard employed in the Wisconsin case of *State v. Watson*, 595 N.W.2d 403, 420 (Wis. 1999), to guide probable cause hearings in sexually violent person proceedings. *Id*. We noted that we had previously found the Wisconsin statute to be substantially similar to our own state statute, and found the *Watson* court's rationale to be consistent with this court's approach to probable cause proceedings in criminal cases. *Id.* at 46, 48. The *Watson* court likened the probable cause hearing to a preliminary hearing in a felony case, which "is designed to prevent 'hasty, improvident or malicious prosecution' and 'to discover whether there is substantial basis for bringing the prosecution and further denying the accused his right to liberty.' [Citation.]" *Watson*, 595 N.W.2d at 418.

¶ 58 Under the standard we enunciated in *Hardin*, the moving party is merely required to " 'establish a *plausible account* on each of the required elements to assure the court that there is a substantial basis for the petition.' " (Emphasis in original.) *Hardin*, 238 Ill. 2d at 48 (quoting *Watson*, 595 N.W.2d at 420). "In making that determination, the trial judge must consider 'all reasonable inferences that can be drawn from the facts in evidence.' " *Id*. However, at this stage of the proceedings, the role of the trial judge is not to " 'choose between conflicting facts or inferences' " (*id*.) or to engage in a "full and independent evaluation of [an expert's] credibility and methodology" (*id.* at 53). The trial court "should not attempt to determine definitively whether each element of the [movant's] claim can withstand close scrutiny as long as some 'plausible' evidence, or reasonable inference based on that evidence, supports it." *Id.* at 51-52.

¶ 59 Although the facts in *Hardin* dealt with a precommitment probable cause hearing under section 30 of the Act, we find that these same principles equally apply to postcommitment probable cause hearings on petitions for discharge or conditional release. "[T]he hearing is intended to be preliminary in nature, a 'summary proceeding to determine essential or basic facts as to probability' *** remaining cognizant of the respondent's liberty rights." *Id.* at 52 (quoting *Watson*, 595 N.W.2d at 420). Thus, no compelling reason exists to treat those proceedings differently for purposes of the probable cause standard.

¶ 60 We reject the State's contention that the circuit court's role in assessing the evidence in the postcommitment probable cause hearing is different than in a precommitment proceeding. The general presumption is that words in a statute are given their ordinary and commonly understood meanings. *People v. Phelps*, 211 Ill. 2d 1, 15 (2004). "Where a word is used in different sections of the same statute, the presumption is that the word is used with the same meaning throughout the statute, unless a contrary legislative intent is clearly expressed." *People v. Maggette*, 195 Ill. 2d 336, 349 (2001).

¶ 61    The State asserts that in a postcommitment probable cause hearing, the Act presupposes that there may be conflicting expert opinions and the court should weigh those conflicting opinions against each other in determining whether there is a reasonable basis for the petition to proceed to an evidentiary hearing or trial. The State maintains that in a precommitment probable cause hearing, in contrast, the detainee is not entitled to present an expert and, therefore, the court would never be in a position to weigh competing opinions, warranting a different assessment.

¶ 62    We reject the State's premise. Nothing in the Act precludes an individual from presenting evidence at a precommitment probable cause hearing, whether the evidence be presented from cross-examination or from the presentation of a witness. Section 25(c) of the Act expressly provides that, with exceptions not relevant here, at any hearing, any individual who is the subject of a petition for commitment has the right "[t]o present and cross-examine witnesses." 725 ILCS 207/25(c) (West 2008). The court's role in assessing the evidence remains the same throughout the various probable cause hearings; that role is to determine whether the movant has established " 'a *plausible account* on each of the required elements to assure the court that there is a substantial basis for the petition.' " (Emphasis in original.) *Hardin*, 238 Ill. 2d at 48 (quoting *Watson*, 595 N.W.2d at 420). Thus, the State has not demonstrated that the legislature meant something different when it used the identical term in sections 30(b), 60, 65 and 70 of the Act.

¶ 63    A similar argument was made by the State and rejected in the Wisconsin case of *In re Commitment of Kruse*, 2006 WI App 179, 296 Wis. 2d 130, 722 N.W.2d 742. There, the State asserted that at the probable cause hearing on a petition for discharge, the circuit court should decide which of two conflicting reexamination reports is more persuasive. The appellate court rejected that argument, finding instead that the purpose of the probable cause hearing was similar to the purpose of a preliminary examination in that it "performs a 'gatekeeping function' by 'provid[ing] an opportunity for the committing court to weed out frivolous petitions by committed persons alleging that they are no longer dangerous and are fit for release.' " *Id.* ¶ 31 (quoting *In re Commitment of Paulick*, 570 N.W.2d 626, 629 (Wis. Ct. App. 1997)). The court found that the purpose of the hearing was to determine if there was an adequate basis for an evidentiary hearing, but was not a substitute for an evidentiary hearing. *Id.* Accordingly, the court held that the circuit court's role was to determine whether there was a plausible expert opinion that, if believed, would establish probable cause to believe the individual was no longer a sexually violent person within the meaning of the statute. *Id.* ¶ 32.

¶ 64    To allow the trial judge to weigh conflicting evidence and choose between expert opinions at this "summary proceeding" would be beyond the scope of the limited inquiry intended at a probable cause hearing and would render meaningless and unnecessary the subsequent sections of the Act providing for a full hearing or trial. The probable cause hearing is not a substitute for a full evidentiary hearing where disputed questions of fact can be resolved by the trier of fact, and where the basis for the opinions and credibility determinations can be fully explored. See *In re Detention of Cain*, 402 Ill. App. 3d 390, 397 (2010) (Stewart, J., dissenting) (to allow the court to choose between conflicting opinions at a probable cause hearing would "allow[ ] the court to bypass all of the truth-seeking

-15-

functions and protections of our rules of evidence"). Accordingly, for all of the foregoing reasons, we hold that the quantum of proof and the circuit court's role in assessing the evidence at a postcommitment probable cause hearing is the same as that expressed by this court in *Hardin*.

¶ 65                    C. Scope of the Probable Cause Hearing

¶ 66    We next consider the parties' dispute regarding the scope of evidence that is relevant to these proceedings and whether the evidence adduced at the probable cause hearings was sufficient to meet the probable cause standard.

¶ 67    At the outset, we stress that our consideration of this issue is dependent upon the relevant statutory scheme at the time of these proceedings only, and does not address the scope of the postcommitment proceedings under subsequent amendments. Under the relevant statute applicable to these cases, to support a finding of probable cause on a petition for conditional release under section 60(c), the committed person bears the burden to show sufficient evidence "to believe that it is not substantially probable that the person will engage in acts of sexual violence if on release or conditional release." 725 ILCS 207/60(c) (West 2008). To support a finding of probable cause on a petition for discharge under section 65(b)(1) or on a first petition for discharge under section 70, the movant bears the burden to show sufficient evidence to warrant a hearing on whether the person is "*still* a sexually violent person." (Emphasis added.) 725 ILCS 207/65(b)(1), 70 (West 2008). To make that determination, the court must find that there is a plausible account that "the committed person is *no longer* a sexually violent person." (Emphasis added.) 725 ILCS 207/65(b)(2) (West 2008).

¶ 68    Given the statutory definition of a "sexually violent person," it follows that in a discharge proceeding, the committed individual must present sufficient evidence that he no longer meets the elements for commitment: (1) he *no longer* "has a mental disorder"; or (2) he is *no longer* "dangerous to others because the person's mental disorder [*no longer*] creates a substantial probability that he *** will engage in acts of sexual violence." (Emphasis added.) 725 ILCS 207/5(f), 15 (West 2008).

¶ 69    The State maintains in both of these consolidated appeals that the experts' opinions do not address the relevant statutory elements under the Act. Specifically, the State argues that the legislature intended the statutory terms "no longer" and "still" in section 65(b)(1) to mean that there must be some plausible evidence of changed circumstances since the jury's original finding to warrant an evidentiary hearing or jury trial. The State argues that the legislature did not intend to permit relitigation of the determination that these individuals have already been adjudicated sexually violent persons.

¶ 70    Whether the experts' opinions in these cases are relevant to establishing probable cause to believe that the petitioners are "no longer" or are not "still" sexually violent requires a construction of the statutory terms, which we review *de novo*. *People v. Johnson*, 2011 IL 111817, ¶ 15. The primary goal of statutory construction is to ascertain and give effect to the intent of the legislature. *People v. Marshall*, 242 Ill. 2d 285, 292 (2012). We must construe the statute as a whole and afford the language its plain and ordinary meaning. *Id*. We must also avoid rendering any part meaningless or superfluous, and consider words and phrases

in light of other relevant provisions of the statute. *Id.* In construing the statute, we may also consider the consequences of construing the language one way as opposed to another and, in doing so, we presume the legislature did not intend the statute to have absurd, inconvenient, or unjust consequences. *Id.* at 293. The court may also properly consider the reason and necessity for the law, the evils sought to be remedied and the purpose to be achieved. *Botruff*, 212 Ill. 2d at 175.

¶ 71    The statutory terms "no longer" and "still" have not previously been construed in Illinois. However, we find the Wisconsin case of *In re Commitment of Combs*, 2006 WI App 137, 295 Wis. 2d 457, 720 N.W.2d 684, to be instructive. In *Combs*, the court construed the "no longer" and not "still" language under a similar statutory scheme and concluded that:

> "[I]n order to provide a basis for probable cause to believe a person is no longer sexually violent *** an expert's opinion must depend upon something more than facts, professional knowledge, or research that was considered by an expert testifying in a prior proceeding that determined the person to be sexually violent. By way of example, an opinion that a person is not sexually violent based at least in part on facts about the committed person that did not occur until after the prior adjudication would meet this standard, as would an opinion based at least in part on new professional knowledge about how to predict dangerousness. These examples are not exhaustive." *Id.* ¶ 32.

The court rejected the proposition that probable cause may be established "without regard to whether that opinion is based on matters that were already considered by experts testifying at the commitment trial or a prior evidentiary hearing." *Id.* The court reasoned that requiring a change in the person's condition or new research or methodology "serves the purpose of ensuring that a person who is not sexually violent does not continue in commitment, while avoiding continual relitigation of issues." *Id.* ¶ 33. As a result, the court concluded that a reevaluation which reached a conflicting opinion regarding the likelihood that the petitioner would reoffend, but which relied on the same historical facts and methodologies already adjudicated at trial, was insufficient to establish probable cause to believe that the individual was no longer a sexually violent person. See also *In re Commitment of Kruse*, 2006 WI App 179, ¶¶ 35-41, 296 Wis. 2d 130, 722 N.W.2d 742 (affirming the trial court's finding of no probable cause where the expert report did not rely on any new facts, professional knowledge, or research not previously adjudicated at the initial commitment proceeding).

¶ 72    The construction in *Combs* comports with the plain meaning of our statute when read as a whole. By using the terms "no longer" and "still," the legislature intended that the relevant inquiry must begin with the premise that the individual has been adjudicated in the past with a mental disorder that makes it substantially probable that he will reoffend. The legislature intended that in postcommitment proceedings for discharge, the individual must present some plausible evidence that demonstrates a change in the circumstances that led to this finding. To hold otherwise would render the terms "no longer" or "still" superfluous. Under the relevant statutory scheme, a change in circumstances could include a change in the committed person, a change in the professional knowledge and methods used to evaluate a person's mental disorder or risk of reoffending, or even a change in the legal definitions of a mental disorder or a sexually violent person, such that a trier of fact could conclude that

the person no longer meets the requisite elements.

¶ 73                                    1. *Stanbridge*

¶ 74        Applying these principles, we address each case in turn to determine whether the experts presented a plausible account that these individuals were "no longer" sexually violent persons. At the outset, we note that this court may affirm a trial court's judgment on any grounds which the record supports even if those grounds were not argued by the parties. *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶ 48. At Stanbridge's probable cause hearing, the trial court recalled that Dr. Witherspoon previously gave an opinion at the commitment trial that Stanbridge was not a sexually violent person in need of institutional care. The trial court, having presided over that proceeding, found that Dr. Witherspoon's amended report rendered many of the same conclusions at the time of the original trial. The trial court further noted that these opinions were rejected by the jury. Therefore, the trial court concluded that Dr. Witherspoon had not presented sufficient evidence of changed circumstances to warrant a full hearing on his petition.

¶ 75        Although the record does not include Dr. Witherspoon's prior evaluation at the initial commitment proceedings, based upon the unpublished order from Stanbridge's direct appeal, Dr. Witherspoon previously testified that his evaluation of Stanbridge did not reveal any sexual psychopathology or sexual deviant tendencies and that Stanbridge presented a low risk of reoffending. *In re Kevin S.*, No. 4-08-0163 (2008) (unpublished order under Supreme Court Rule 23). In Dr. Witherspoon's amended psychological evaluation report, he renders the same conclusions and continues to believe that Stanbridge's risk remains low.

¶ 76        There is no indication that the bases for Dr. Witherspoon's new diagnoses are predicated upon any new facts or professional knowledge or research that was not already considered by the experts testifying at the commitment trial and rejected by the jury. Stanbridge concedes that "Dr. Witherspoon did not address factors related to Mr. Stanbridge's progress, change in condition or treatment as it relates to diagnosis." Furthermore, there is no indication that Dr. Witherspoon's scoring of the actuarial instruments was based on any events or factual information that was not already considered and rejected at the commitment trial. Although Dr. Witherspoon considered denial as a dynamic risk factor that he believes may now be considered as a protective factor in evaluating risk of recidivism, Dr. Witherspoon did not opine that such a change could alone support a finding that Stanbridge is no longer a sexually violent person. Nor has he represented that the 2002R revised actuarial instrument yielded remarkably different scores for Stanbridge than the Static 99, previously administered. Without some evidence of sufficient progress or other relevant changed circumstances, the opinion was insufficient to establish probable cause. Therefore, the trial court properly concluded that Stanbridge had not presented a plausible account that he was "no longer a sexually violent person." 725 ILCS 207/65(b)(2) (West 2008).

¶ 77                                    2. *Lieberman*

¶ 78        Dr. Schmidt's first opinion that paraphilia NOS-nonconsent is not a valid mental disorder is not directed at the statutory relevant criteria as to whether Lieberman is no longer a sexually violent person. Dr. Schmidt testified that the diagnosis does not exist in the DSM.

Dr. Ostrov and Dr. Suire testified that the diagnosis is valid and finds support in the DSM, although not specifically listed as a disorder in the manual. Dr. Schmidt's opinion recognized a controversy in the profession regarding the validity of the diagnosis and acknowledged that it has been an ongoing debate in the field and literature for the last 20 years. Indeed, we are cognizant that the conflicting professional views on the subject have been vigorously argued by others committed under the same diagnosis. See *McGee v. Bartow*, 593 F.3d 556, 580 (7th Cir. 2010) (addressing the debate regarding the validity of the diagnosis in a *habeas* challenge and ruling that the diagnosis of a rape-related paraphilic disorder is "not so unsupported by science that it should be excluded absolutely from consideration by the trier of fact").[8]

¶ 79    Nevertheless, the purpose of these proceedings is to raise a plausible account that Lieberman no longer has the disorder. Lieberman has already been found beyond a reasonable doubt by a jury to meet the legal definition of having a valid mental disorder. Lieberman cannot relitigate the fact that, in 2006, he was diagnosed with the disorder. Thus, the proper issue before the court applying the statute should be whether there was a plausible account of changed circumstances such that he *no longer* has the mental disorder for which he was already adjudicated in 2006. Dr. Schmidt's repeated explanation of an acknowledged 20-year-long debate in the medical community is not evidence of changed circumstances since Lieberman's commitment. Accordingly, Dr. Schmidt's testimony on the validity of the mental disorder is not relevant in this discharge proceeding.

¶ 80    Furthermore, Dr. Schmidt's opinion that Lieberman does not currently have the mental disorder of paraphilia was insufficient to establish probable cause to believe that he is no longer sexually violent. The opinion was based upon historical facts, professional knowledge, and research already debated by the experts testifying in the prior proceeding and rejected by the jury. Dr. Diane Lytton testified on behalf of Lieberman at his commitment trial. In support of her finding that Lieberman did not have a paraphilia, she based her opinions on Lieberman's family and social upbringing, his psychosocial development, and the 15 mental health evaluations compiled while he was incarcerated, which did not diagnose a paraphilia. She also relied upon Lieberman's behavior while in prison, the fact that he was allowed to be around women, his attitudes toward women in his past relationships, and the fact that rape is not necessarily paraphilic. The jury rejected these same opinions. See *In re Detention of Lieberman*, 379 Ill. App. 3d at 594-97.

¶ 81    Additionally, Dr. Schmidt offered no opinion on whether, assuming Lieberman had a mental disorder, he was no longer substantially likely to reoffend if released into the community. Dr. Schmidt offered no testimony directed at Lieberman's future risk of reoffending. The only opinion he offered related to this criteria was that those individuals that have administered and scored Lieberman on the GAF scale believe that his symptom

---

[8] Dr. Schmidt noted that the American Psychiatric Society has formed a task force to study this issue and they have reported their opposition to the misuse of nonofficial diagnoses as applied to these sexually violent persons commitment laws, finding that they "threaten to undermine the legitimacy of the medical model of commitment."

severity and functioning capacity had improved substantially since he was detained in 1999. However, Dr. Schmidt offered no opinion on whether *he* believed Lieberman would no longer be substantially likely to reoffend based upon the GAF score alone if released into the community. Accordingly, we cannot infer that based upon the testimony regarding his GAF score alone, Dr. Schmidt was of the opinion that Lieberman would no longer be a danger to the community. Accordingly, the trial court properly concluded that Lieberman had not presented a plausible account that he was "no longer a sexually violent person." 725 ILCS 207/65(b)(2) (West 2008).

¶ 82     We also reject Lieberman's contention that he established probable cause to warrant a hearing on his conditional release under section 60(c) of the Act. Dr. Ostrov, the court's appointed expert on conditional release, reported that there was insufficient evidence to believe that it is not substantially probable that Lieberman will engage in acts of sexual violence if released or conditionally discharged. 725 ILCS 207/60(c) (West 2008). As stated previously, we find nothing in Dr. Schmidt's testimony that, if believed, would support a plausible account that Lieberman had made sufficient progress to show that he was substantially unlikely to reoffend if released into the community. Accordingly, the trial court properly denied Lieberman's petition for conditional release.

¶ 83                    D. Violation of Due Process and *Ex Post Facto* Clause

¶ 84     Lastly, we consider Lieberman's contention that his continued confinement violates both the due process and *ex post facto* clauses because it is premised solely on his past criminal conduct. We disagree. The *ex post facto* clause, under article I, section 10, of the United States Constitution, prohibits the states from passing any law that retroactively alters the definition of a crime or increases the punishment for a criminal act. *Collins v. Youngblood*, 497 U.S. 37, 43 (1990). Only penal statutes may implicate federal *ex post facto* protection. *Kansas v. Hendricks*, 521 U.S. 346, 370 (1997). "An Act, found to be civil, cannot be deemed punitive 'as applied' to a single individual in violation of the *** *Ex Post Facto* Clause[ ] and provide cause for release." *Seling v. Young*, 531 U.S. 250, 267 (2001). Thus, the constitutional principles prohibiting *ex post facto* laws apply only to criminal proceedings. *Hendricks*, 521 U.S. at 361.

¶ 85     Furthermore, due process permits an individual to be held as long as he or she is both mentally ill and dangerous, but no longer. *Foucha v. Louisiana*, 504 U.S. 71, 77 (1992). The State's experts opinion was that Lieberman continues to have a mental disorder and that he continues to be dangerous. To the extent that the experts relied on prior criminal conduct to make that determination, the experts opinions when viewed in context used "such conduct *** solely for evidentiary purposes, either to demonstrate that a 'mental abnormality' exists or to support a finding of future dangerousness." *Hendricks*, 521 U.S. at 362. The evidence presented did not seek to "affix culpability for prior criminal conduct." *Id.* Rather, it used the prior acts "solely for evidentiary purposes" to support a finding of Lieberman's mental disorder and future dangerousness. *Id*. at 371. As Dr. Suire testified, he considered not merely the convictions, but the pattern of behaviors, the frequency, and other related considerations to determine if the driving force behind the rape-type behavior was a specific

urge toward nonconsenting sexual contact. As *Hendricks* explained, evidence of a prior criminal act in a civil commitment proceeding may represent an " 'important indicator of future violent tendencies.' " *Id.* at 358 (quoting *Heller v. Doe*, 509 U.S. 312, 323 (1993)). Both experts explained that Lieberman's past behaviors were important predictors of future sexual violence. Accordingly, we find no merit to Lieberman's constitutional contentions.

¶ 86                                               III. CONCLUSION

¶ 87        To summarize, we hold that the quantum of proof and the circuit court's role in assessing the evidence at a postcommitment probable cause hearing is the same as that expressed by this court in *Hardin*. We further hold that based upon the relevant elements applicable to these proceedings, the legislature intended that to present a plausible account, the committed individual bears the burden to present sufficient evidence that demonstrates a change in the circumstances that led to the initial commitment. Applying these principles to these consolidated cases, we hold that the trial court properly dismissed the petitions for discharge and conditional release.

¶ 88        No. 112337—Appellate court judgment reversed.

¶ 89                                Circuit court judgment affirmed.

¶ 90        No. 112802—Affirmed.