2015 IL App (2d) 140532
No. 2-14-0532
Opinion filed September 30, 2015

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| *In re* COMMITMENT OF STEVEN KIRST | ) | Appeal from the Circuit Court |
| | ) | of Lee County. |
| | ) | |
| | ) | No. 09-MR-55 |
| | ) | |
| | ) | |
| (The People of the State of Illinois, Petitioner- | ) | Honorable |
| Appellee, v. Steven Kirst, Respondent- | ) | Daniel A. Fish, |
| Appellant). | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices Hutchinson and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1    In these proceedings under the Sexually Violent Persons Commitment Act (Act) (725

ILCS 207/1 *et seq.* (West 2012)), respondent, Steven Kirst, appeals from the trial court's orders:

(1) denying his motion for an independent examiner as part of his periodic reexamination under

the Act; and (2) ruling that no probable cause existed to warrant an evidentiary hearing on the

issue of whether he remained a sexually violent person (SVP).  For the following reasons, we

affirm.

¶ 2                                A.  BACKGROUND

¶ 3    The record reflects that in 2009 the State petitioned the trial court to commit respondent

pursuant to the Act.  725 ILCS 207/1 *et seq.* (West 2008).  In the petition, the State alleged that

respondent had been convicted of indecent solicitation of a child in 2005 and again in 2007. The State also alleged that respondent suffered from two mental disorders that affected his emotional or volitional capacity and predisposed him to commit acts of sexual violence: (1) pedophilia, sexually attracted to females; and (2) paraphilia not otherwise specified (telephone scatologia).[1] The State alleged that respondent was dangerous to others because these mental disorders made it substantially probable that he would engage in acts of sexual violence. In March 2010, respondent stipulated that he was an SVP and agreed to be committed to the custody of the Illinois Department of Human Services (IDHS). The trial court accepted the stipulation and ordered respondent to be committed to IDHS for institutional treatment. During his commitment, respondent received periodic evaluations as required by section 65 of the Act (725 ILCS 207/65 (West 2012)). Following each evaluation, the trial court found no probable cause to warrant an evidentiary hearing to determine whether respondent was still an SVP.

¶ 4    On September 13, 2013, Dr. Edward Smith, a licensed clinical psychologist, performed the latest evaluation of respondent and prepared a report as required by the Act. After reviewing the report, on December 12, 2013, the State moved for a finding of no probable cause to warrant an evidentiary hearing to determine whether respondent was still an SVP. Dr. Smith's report was submitted in support of the State's motion. In the report, Dr. Smith concluded that respondent was substantially probable to engage in future acts of sexual violence and that he should remain in a secure facility for institutional treatment.

---

[1] "Telephone scatalogia" is defined as a disorder wherein a person experiences recurrent and intense sexual arousal from making obscene telephone calls. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, DSM-5 *Paraphilic Disorders*, at 705 (2013).

¶ 5    In preparing his report, Dr. Smith conducted a 45-minute interview with respondent and reviewed his previous psychological evaluations and IDHS treatment and progress reports. Dr. Smith's report set out respondent's personal history, his participation in IDHS sex-offender treatment, his criminal charges and convictions, and his mental health treatment history.

¶ 6    With regard to respondent's previous offenses, Dr. Smith noted that respondent was convicted of telephone harassment in 1995 and sentenced to one year of conditional discharge. In that case, respondent confessed that he called an eight-year-old girl, asked her if she was "playing with herself," and told her that he was "playing with himself."

¶ 7    In 1999, respondent pled guilty to child abduction. When interviewed by police in connection with that case, respondent admitted that between April and June 1998 he attempted to lure three girls into his car. He told the police that he wanted to tell those girls that he loved them, but they became scared and ran away. He also said that he found it easier to speak to young girls, because they did not make fun of him the way adult women did.

¶ 8    In January and February 2003, Dixon police were contacted by parents who complained that their 11-year-old daughter, K.K., received phone calls from a man who told her, "I want to lick your pussy." In the next two years, police in Lee, Ogle, and Carroll Counties received numerous reports of obscene phone calls made to girls between the ages of 6 and 10, some of whom the caller asked for by name. In February 2005 the police questioned respondent about the calls. He initially admitted to making 10 to 15 such calls over the years, but then he said that he made only 2 calls. Finally, he confessed to making 35 to 40 calls over the last two years. Respondent told the police that he asked at least three girls if they touched their "pussy" and that he "possibly" asked another girl if he could put his finger in her "butt crack." With regard to K.K., he told the police that he asked her what color her panties were, told her to touch herself,

and masturbated to her picture while on the phone with her on three occasions. Based upon this information, respondent was charged with three counts of indecent solicitation of a child and five counts of telephone harassment. He was convicted of one count of indecent solicitation of a child and was sentenced to four years' imprisonment.

¶ 9    Less than two weeks after his release from prison for the indecent-solicitation offense in March 2007, respondent was charged again with indecent solicitation of a child and telephone harassment. He pled guilty to indecent solicitation of a child and was sentenced to five years' imprisonment.

¶ 10    Dr. Smith indicated in the report that, in addition to the charged crimes, respondent self-reported during a January 2012 penile plethysmograph examination that he victimized 3,976 girls between the ages of 7 and 15 over the phone. He also self-reported that he assaulted his brother's girlfriend's 4-year-old daughter when he was 19 years old. Specifically, he said that he had fondled the girl 107 times, touching her back, stomach, legs, and buttocks.

¶ 11    Dr. Smith discussed respondent's difficulties with treatment during his commitment at IDHS. At the time of his 2013 evaluation, respondent was in phase two of the five-phase core sex-offender treatment program. The IDHS report indicated that, while participating in group therapy, respondent continued to engage in "treatment-interfering behaviors," such as lying and "playing games," and he struggled with accurately disclosing his prior crimes, because he was concerned about his image. When challenged with inaccuracies and contradictory statements, respondent resorted to silence, justifications, or victim-blaming. In January 2013 respondent said that he viewed his offending history as "no big deal," because it mostly took the form of obscene telephone calls. In February 2013 respondent moved from the core treatment program to a "treatment foundations" group, in order to address "treatment barriers." However, even after

he began the treatment foundations group, he continued to struggle with understanding and presenting the treatment concepts clearly. An April 2013 report noted that respondent had a "very minimal understanding of treatment concepts," and it was recommended that he participate in the group therapy again.

¶ 12    Dr. Smith reported that, during the interview with respondent, respondent stated that he had ceased watching "high risk" television programs depicting young children, but he still masturbated around four times a month to deviant fantasies involving sexual acts with children. Respondent estimated his level of control over his deviant arousal as a 5 out of 10. Dr. Smith concluded that respondent was still in the early stages of treatment and could not be safely managed in a less restrictive environment.

¶ 13    Based upon his review of respondent's treatment records, police reports, and a personal interview with him, Dr. Smith diagnosed respondent with: (1) pedophilic disorder, sexually attracted to females, nonexclusive type; and (2) other specified paraphilic disorder (telephone scatalogia). Dr. Smith ruled out a diagnosis of "cannabis use disorder, in a controlled environment" on the basis that additional information was needed before a definitive diagnosis could be reached.

¶ 14    Dr. Smith's risk assessment indicated that respondent was "at a substantial probability to engage in acts of sexual violence." The actuarial tool Dr. Smith used to conduct his risk assessment was the Static-99R. Respondent scored a 6 on the Static-99R, which, according to Dr. Smith, placed him in the high-risk category, with a relative risk 2.91 times higher than that of the typical sex offender. Dr. Smith's research also indicated that the percentage of offenders with that score who were recharged with or reconvicted of a sexual offense was 31.2% in 5 years and 41.9% in 10 years. Dr. Smith described the Static-99R as follows:

"The Static-99 is an actuarial measure of relative risk designed to assess for sexual offense recidivism which has been shown to have moderate accuracy in ranking offenders according to their relative risk for sexual recidivism. Furthermore, its accuracy in assessing relative risk has been consistent across a wide variety of samples, countries, and unique settings ***. Given that the Static-99R was found to fully incorporate the relationship between age at release and sexual recidivism whereas the original Static-99 scale did not ***, the developers of the Static-99R recommend that the revised version of the scale (Static-99R) replace the Static-99 in all contexts where it is used."

¶ 15    Dr. Smith measured respondent's absolute recidivism risk by comparing him to the high-risk/high-needs sample group, which encompassed offenders who were referred to intensive treatment programs or identified as high risk through judicial or administrative processes. He determined that, because respondent had gone through a rigorous screening process—which eliminated 96% to 98% of all incarcerated sex offenders in Illinois—and he was adjudicated an SVP, respondent fit that high-risk/high-needs category.

¶ 16    Dr. Smith identified other empirical risk factors that bore on respondent's risk of reoffending. Those risk factors were not measured by the Static-99R but were additional factors that were culled from two "meta-analyses," one of which used 152 data sets from 95 scientific research articles and included 31,216 sex offenders. From those studies, Dr. Smith determined that respondent met seven additional risk factors: intimate relationship conflicts, any deviant sexual interest, sexual interests with children, any paraphilic interests, employment instability, any substance abuse, and identification with children. Finally, Dr. Smith opined that the results of the Static-99R, in addition to the other risk factors, suggested that he was at a substantial probability to reoffend.

¶ 17   On March 11, 2014, respondent filed a motion for the appointment of an independent examiner.   In the motion, respondent alleged that:   (1) he had been in treatment and made sufficient progress to warrant conditional release; and (2) the evaluation conducted by Dr. Smith contained conclusions based on methods and measures that were insufficient to determine the criteria under the statute.   He therefore requested the appointment of Dr. Kurt Witherspoon, a qualified examiner.   Respondent attached Dr. Witherspoon's curriculum vitae as an exhibit.

¶ 18   A hearing on respondent's motion was held on April 22, 2014.   At the hearing, respondent's counsel argued that in scoring respondent on the Static-99R Dr. Smith erroneously placed respondent in the high-risk/high-needs group.   According to counsel, at a recent Association for Treatment of Sexual Abusers (ATSA) conference, the authors of the Static-99R cautioned against measuring offenders' absolute recidivism rate by reference to the high-risk/high-needs group and recommended assessing instead only offenders' relative risk of recidivism.   Counsel also introduced as exhibits two peer-reviewed articles that criticized the way the Static-99R computed an offender's risk of reoffending.

¶ 19   Counsel also noted that, according to the DSM-5, pedophilia appears to be a lifelong condition "per se."   However, pedophilic disorder, which Dr. Smith diagnosed respondent with, can change over time with or without treatment.   Therefore, counsel contended, the course of pedophilic disorder can fluctuate, increasing or decreasing with age.   For all those reasons, counsel argued, respondent had made a sufficient showing that he was entitled to his own examiner.

¶ 20   In response, the State argued that it had also attended the ATSA conference and did not recall any of the authors of the Static-99R indicating that the test should not be used; if there were anything in print to that effect, the State would like to review it.   The State argued that there

had always been disputes about the use of the Static-99R. In any event, however, respondent had not made substantial progress in treatment such that he was no longer an SVP. Respondent was only in phase two out of five total phases in the sex-offender treatment program, and there was nothing to indicate that anything had changed since his most recent periodic reexamination. Finally, the State noted that it was within the trial court's discretion whether to appoint an examiner at that point, and, since respondent had not petitioned for discharge or conditional release, it asked that respondent's motion be denied as it was simply not currently warranted.

¶ 21 In reply, respondent's counsel said that her source of information regarding the Static-99R came from multiple sources, including doctors who practiced in the field nationwide and doctors who attended the ATSA conference. She also said that she was arguing not that the Static-99R should never be used, but only that the reference group should be a "routine sample," which was reflective of an average sex offender, instead of the higher-risk group.

¶ 22 In denying the motion, the trial court made the following comments:

"Okay, I've had an opportunity to give some consideration to the arguments, as well as the pleadings, the documents provided in this particular instance, and the Court agrees that the fact that there has not been any type of a petition for conditional release or discharge filed, important and pertinent to this particular proceeding, and nothing presented at this point by the defendant amounts to much more than speculation as to the attacks and authenticity of a report. I don't believe that the respondent in this—at this particular time has shown a need for an expert at this time, especially in light of the progress as has been indicated in his rehabilitation at this point, so at this time I'm going to deny the respondent's request."

¶ 23    On May 27, 2014, a probable-cause hearing was held.  At the hearing, the State argued that pursuant to Dr. Smith's report respondent still suffered from pedophilic disorder, sexually attracted to females, nonexclusive type, and other specified paraphilic disorder (telephone scatalogia).  There was nothing to indicate that respondent no longer suffered from these mental disorders or had done enough to reduce his risk of recidivism.  Also, Dr. Smith had used the Static-99R to assess respondent's risk of reoffending and had placed respondent in the high-risk category.  Dr. Smith had also identified seven empirical risk factors that contributed to respondent's risk of reoffending.  Further, respondent had been in phase two of the core treatment program but had voluntarily transferred out of that program and into "treatment foundations" in order to deal with certain treatment barriers.  The State concluded by requesting that the trial court find that there was no probable cause to warrant an evidentiary hearing on the issue of whether he remained an SVP.

¶ 24    Respondent's counsel argued that Dr. Smith's conclusions were based on respondent's history of offending and not on his current mental status.  Dr. Smith's 2013 report summarized respondent's personal and developmental history, his educational and employment background, and his mental health and treatment history beginning in 1998; it referenced other evaluations going back to June 2005; and it relied on an interview that Dr. Smith conducted with respondent in 2010.  Because this information was irrelevant to the issue of respondent's condition since the last periodic reexamination, the court should give little weight to Dr. Smith's conclusions regarding respondent's mental disorders.

¶ 25    With regard to respondent's risk of reoffending, counsel argued that Dr. Smith's finding that respondent was 2.91 times more likely to do so than the average sex offender was misleading because:  (1) Dr. Smith chose to evaluate him as a high-risk offender when the

typical sex offender is the lowest-risk sex offender; and (2) even 2.91 times more likely to reoffend was still a low risk of reoffending. Dr. Smith did not explain how the additional empirical risk factors added to the predictive accuracy of the Static-99R. Also, the report included substance abuse as an additional risk factor, but Dr. Smith had previously ruled out substance abuse as one of respondent's mental disorders. Further, the report was flawed because Dr. Smith used the additional risk factors of deviant sexual interests, sexual interests in children, and paraphilic interests not only in assessing respondent's risk of reoffending but also in making the two mental disorder diagnoses, which created issues "in terms of drawing the conclusions from the same set of facts."

¶ 26    In response, the State argued that the purpose of a probable-cause hearing is for the court to determine whether facts exist to show that, since the most recent periodic reexamination, the respondent's condition has so changed that he is no longer an SVP. However, the State contended, Dr. Smith's report indicated that respondent was not even in the core sex-offender treatment program during the most recent reexamination period and that, according to tools that were accepted in this field, respondent's recidivism risk had not decreased.

¶ 27    Based on the applicable law, Dr. Smith's report, and the arguments of counsel, the trial court found that there was no probable cause to warrant an evidentiary hearing regarding respondent's status as an SVP.

¶ 28                                    II.  ANALYSIS

¶ 29    On appeal, respondent argues that: (1) the trial court abused its discretion in denying his motion for an independent examiner; and (2) the trial court erred in granting the State's motion for a finding that no probable cause existed to warrant an evidentiary hearing as to whether he remained an SVP. We will address each argument in turn.

¶ 30                              A.  Motion for Independent Examiner

¶ 31    Respondent first argues that the trial court abused its discretion in denying his motion for an independent examiner when, at the hearing on the motion, his counsel raised several reasons why the appointment of an independent examiner was crucial to his defense.  Specifically, he contends that there was a change in the professional knowledge pertaining to the Static-99R.  In support of his argument, respondent cites *People v. Botruff*, 212 Ill. 2d 166, 175-76 (2004) and *In re Detention of Stanbridge*, 2012 IL 112337.

¶ 32    Illinois law requires that, if a person has been committed under the Act and not discharged, IDHS shall evaluate the individual's mental condition within six months of the initial commitment and again thereafter at least annually.  725 ILCS 207/55 (West 2012).  The purpose of these periodic reexaminations is to determine whether:  (1) the person has made sufficient progress in treatment to be conditionally released; and (2) the person's condition has so changed since the most recent periodic examination (or initial commitment, if no reexamination has been made) that he or she is no longer an SVP.  725 ILCS 207/55(a) (West 2012).   At the time of reexamination, the committed person receives written notice of the right to petition the court for discharge.  725 ILCS 207/65(b)(1) (West 2012).  The notice must contain a waiver of rights.  *Id.*  If the committed person does not waive the right to petition for discharge, the court conducts a probable-cause hearing to determine if facts exist to warrant a further hearing on the issue of whether the person remains an SVP.  *Id.*

¶ 33    "While the Act allows for the appointment of an expert for an indigent person, it certainly does not require a court to take such action."  *In re Detention of Cain*, 341 Ill. App. 3d 480, 483 (2003); see 725 ILCS 207/55(a) (West 2012).  A respondent may be entitled to funds to hire an expert witness where expert testimony is deemed "crucial" to a proper defense.  (Internal

quotation marks omitted.) *Botruff*, 212 Ill. 2d at 177. This is established where the respondent demonstrates that his case will be prejudiced if his request is denied. *Id.* Whether to appoint an independent examiner rests within the trial court's sound discretion. *Id.* at 176.

¶ 34 The cases respondent cites do not support his claim that the trial court erred in denying his motion for an independent examiner. In *Botruff*, at the probable-cause hearing, the trial court reviewed the State's reexamination report and then invited comments from the parties about the report. *Id.* at 177. Counsel for respondent did not make any comment about the report other than to request an independent examiner to " 'rebut the findings [in the tendered report].' " *Id.* The trial court denied the respondent's request for an independent examiner. In affirming the trial court's order and reversing the appellate court's ruling on this issue, our supreme court said, "[i]t is rational not to appoint an independent evaluator when a respondent has shown no need for one, especially during perfunctory reexamination proceedings where the respondent has not affirmatively opted to petition for discharge." *Id.* at 177-78. The *Botruff* court concluded that, "[w]ithout more, the court did not abuse its discretion by denying respondent's request for an independent evaluation." *Id.* at 178.

¶ 35 Respondent contends that here, unlike in *Botruff*, his counsel provided several reasons why the appointment of an independent examiner was crucial to his defense. Specifically, counsel argued that, because Dr. Smith had used the Static-99R in assessing respondent's risk of reoffending, an independent examiner was necessary because there was a change in the professional knowledge pertaining to that instrument. This is important, respondent contends, because in *Stanbridge*, 2012 IL 112337, ¶ 71, our supreme court held that an expert's report that relies on new facts or new professional knowledge not previously adjudicated at the initial

commitment proceeding is sufficient evidence to support a finding of probable cause to hold an evidentiary hearing.

¶ 36    We agree with respondent that the facts in *Botruff* are not similar to the facts in this case. Here, counsel *did* do more than simply ask for an independent examiner to rebut the State's report. However, *Botruff* does not stand for the proposition that *any effort* by counsel to rebut the State's report will be sufficiently persuasive for a respondent to be granted an independent examiner. The question, then, is whether respondent proved that his case would be prejudiced if an independent examiner were not appointed, thereby showing that such an appointment was crucial to his defense. *Botruff*, 212 Ill. 2d at 177.

¶ 37    Respondent's appellate counsel does an admirable job of delving into the alleged flaws—outlined in the two peer-reviewed articles admitted into evidence below—of the Static-99R with regard to the probabilities of reoffending. However, the problem with respondent's argument is that it does not demonstrate that an independent examiner was crucial to his defense. Indeed, even if we disregard the Static-99r's method of calculating the risk, several troubling facts remain in Dr. Smith's report with regard to respondent's current status as an SVP.

¶ 38    For example, in his report Dr. Smith listed several additional empirical risk factors that led him to his ultimate determination that respondent was at a substantial probability to engage in acts of sexual violence. Those risk factors were culled from two "meta-analyses," one of which used 152 data sets from 95 scientific research articles and included 31,216 sex offenders. From those studies, Dr. Smith determined that respondent met seven additional risk factors:  intimate relationship conflicts, any deviant sexual interest, sexual interests with children, any paraphilic interests, employment instability, any substance abuse, and identification with children. Although on appeal respondent refers to these factors as "guesswork," he provides no support for

his claim that Dr. Smith, a licensed clinical psychologist and a qualified expert, engaged in "guesswork" when he found that these factors were additional evidence that respondent was still an SVP. Dr. Smith's report also indicated that respondent did little through treatment to reduce his risk of reoffending. He was still in phase two of a five phase program, he continued to lie and "play games" while in treatment, and he had removed himself from the core treatment program to address his "treatment barriers."

¶ 39    We also reject respondent's contention that *Stanbridge* supports his claim that the trial court erred in denying his motion for an independent examiner. *Stanbridge* was a consolidated appeal involving two convicted sex offenders who had been previously adjudicated as SVPs; one respondent petitioned for discharge and the other petitioned for conditional release. *Stanbridge*, 2012 IL 112337, ¶ 1. In that case, the supreme court was asked to "clarify the quantum and scope of evidence needed to establish probable cause in a postcommitment discharge or conditional release proceeding pursuant to the [Act]." *Id*. In doing so, the court held:

> "The legislature intended that in postcommitment proceedings for discharge, the individual must present some plausible evidence that demonstrates a change in the circumstances that led to this finding. *** Under the relevant statutory scheme, a change in circumstances could include a change in the committed person, a change in the professional knowledge and methods used to evaluate a person's mental disorder or risk of reoffending, or even a change in the legal definitions of a mental disorder or a sexually violent person, such that a trier of fact could conclude that the person no longer meets the requisite elements." *Id.* ¶ 72.

¶ 40    The *Stanbridge* court ultimately held that the trial court properly dismissed the petitions for discharge and conditional release in both cases on appeal. *Id*. ¶ 87.

¶ 41    The issue of what a respondent must prove in order to show that an independent examiner is crucial to his case was not an issue in *Stanbridge*.  On the contrary, the *Stanbridge* court was referring to what evidence, *if presented at the probable-cause hearing*, would be sufficient to entitle a respondent to an *evidentiary hearing* on the issue of whether he was still an SVP.   Here, we are considering the stage before the probable-cause hearing, and pursuant to *Botruff* we are simply reviewing whether respondent made a sufficient showing that he would be prejudiced by the denial of his motion for an independent examiner.  *Botruff*, 212 Ill. 2d at 177.

¶ 42    Finally, respondent argues that the trial court's denial of his motion was error, because since his last periodic reexamination, the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, DSM-5 (2013) had replaced the former version of the manual (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision, DSM-IV-TR (2000)) and, according to the DSM-5, pedophilic disorder (which Dr. Smith diagnosed him with) can change over time without treatment.  Therefore, respondent claims, since some components of pedophilic disorder can change with or without treatment, an independent examiner was necessary to determine whether he had made sufficient progress in treatment "in light of his current mental status."

¶ 43    We are not persuaded.   Nothing in the record indicates that respondent's paraphilic disorder *did in fact* remit over time.  To the contrary, ample evidence supported Dr. Smith's conclusion that respondent continued to suffer from pedophilic disorder.   For example, respondent admitted to Dr. Smith that he masturbated approximately four times a month to fantasies involving sexual acts with young children.  Even more alarming, respondent reported that his ability to control those deviant urges was only a 5 out of 10.  For all these reasons, we find respondent failed to demonstrate that an independent examiner was crucial to his defense,

and the trial court did not abuse its discretion in denying respondent's motion for an independent examiner.

¶ 44                              B.  Probable-Cause Hearing

¶ 45     Next, respondent contends that the trial court erred in granting the State's motion to find that no probable cause existed to warrant an evidentiary hearing on the issue of whether he remained an SVP.  Before turning to the merits of this issue, however, we must address the appropriate standard of review.

¶ 46                              1.  Standard of Review

¶ 47     The standard of review for a post-commitment probable-cause hearing pursuant to the Act is not settled law in Illinois.  Here, both respondent and the State claim that the proper standard of review is *de novo.*  In support of their position, they cite *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 453 (2009) ("where the evidence before a trial court consists of depositions, transcripts, or evidence otherwise documentary in nature, a reviewing court is not bound by the trial court's findings and may review the record *de novo*"), and *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 154 (2007) (where trial court does not hear testimony and bases its decision on documentary evidence, the review is *de novo*).

¶ 48     However, both parties acknowledge that some Illinois courts have held, albeit without analysis, that a trial court's decision not to proceed to an evidentiary hearing following a probable cause hearing under the Act is reviewed only for an abuse of discretion.  The Fourth District did so in *In re Ottinger*, 333 Ill. App. 3d 114, 120 (2002), and *In re Commitment of Blakey*, 382 Ill. App. 3d 547, 551 (2008) (citing *Ottinger*, 333 Ill. App. 3d at 120), and the Fifth District did so in *Cain*, 341 Ill. App. 3d at 482.  On the other hand, the First District has more recently stated that we review *de novo* the ultimate question of whether a respondent has

established probable cause. *In re Detention of Lieberman*, 2011 IL App (1st) 090796, ¶ 40, *aff'd sub nom*, *Stanbridge*, 2012 IL 112337.

¶ 49     We agree with the parties that the proper standard of review here is *de novo*.  Illinois law specifically provides that if a person committed under the Act does not file a petition for discharge, yet fails to waive the right to petition, the probable-cause hearing consists only of a review of the reexamination report and the parties' arguments.  725 ILCS 207/65(b)(1) (West 2012).  The existence of probable cause is a question of law and becomes a question of fact only if the operative facts are in dispute.  *Poris v. Lake Holiday Property Owners Ass'n*, 2013 IL 113907, ¶ 63.  Where no testimony is heard and the trial court is simply reviewing documentary evidence, the supreme court has held that the proper standard of review to be applied is *de novo*.  *Townsend*, 227 Ill. 2d at 154.

¶ 50     The operative facts in this case are not in dispute.  Respondent does not argue that the facts in Dr. Smith's report are inaccurate; his contentions are directed only at Dr. Smith's conclusions.  The trial court reviewed Dr. Smith's reexamination report and the exhibits, listened to the attorneys' arguments, and determined that there was no probable cause to warrant an evidentiary hearing.  On appeal, this court has reviewed the same documents that the trial court reviewed and read the transcripts of the same arguments that the trial court listened to.  Accordingly, we agree with the parties that the proper standard of review here is *de novo*.

¶ 51                                    2. Probable Cause

¶ 52     As support for his argument that the trial court erred in finding no probable cause to warrant an evidentiary hearing, respondent raises several points:  (1) Dr. Smith's interview with him lasted only 45 minutes; (2) the reexamination report primarily emphasized his history of offending rather than his current mental state as required by the Act; (3) Dr. Smith used an

incorrect reference group when he used the Static-99R to assess his risk of reoffending; (4) the reexamination report contained the misleading information that respondent was 2.91 times more likely than the average sex offender to reoffend; (5) none of the additional empirical risk factors that Dr. Smith noted in the report added to the predictive accuracy of the Static-99R; (6) the report contained Dr. Smith's conclusions that "substance abuse" was an additional risk factor, but Dr. Smith had ruled out a diagnosis of that same mental disorder; and (7) Dr. Smith "double counted" some of the additional risk factors, such as "deviant sexual interests" and "sexual interests in children," by also using those factors as a basis to support his mental disorder diagnoses.

¶ 53    At a post-commitment probable-cause hearing under the Act, the trial court must "determine whether facts exist to believe that since the most recent periodic reexamination *** the condition of the committed person has so changed that he or she is no longer a sexually violent person." 725 ILCS 207/65(b)(1) (West 2012). If the court finds that probable cause does exist, then it must set an evidentiary hearing on the issue. 725 ILCS 207/65(b)(2) (West 2012).

¶ 54    A sexually violent person is one who: (1) has been convicted of a sexually violent offense as defined in the Act; and (2) is dangerous to others because he suffers from a mental disorder that makes it substantially probable that he will engage in acts of sexual violence. 725 ILCS 207/5(f) (West 2012). Therefore, a respondent is entitled to an evidentiary hearing only if there is probable cause to believe that he: (1) no longer suffers from a mental disorder; or (2) is no longer dangerous to others, because his mental disorder no longer creates a substantial probability that he will engage in acts of sexual violence. See *Stanbridge*, 2012 IL 112337, ¶ 68 (quoting 725 ILCS 207/5(f), 15 (West 2008)).

¶ 55    Here, the fact that the September 11, 2013, interview between respondent and Dr. Smith lasted only 45 minutes is not evidence that the evaluation was flawed.  In arguing that a 45 minute interview is insufficient, respondent does not state what length of time he believes would be sufficient under the Act.  Further, it is clear from the reexamination report that Dr. Smith spent a sufficient amount of time with respondent to elicit answers from him that would, in part, allow Dr. Smith to form a basis to determine whether he was no longer an SVP.  Also, the fact that a large part of Dr. Smith's reexamination report contained respondent's history does not make the report flawed.  The history clearly was provided so that the reader—the trial court (and now this court)—could get a complete picture of respondent's mental illnesses in order to determine whether sufficient change had occurred in the previous 12 months such that respondent was no longer an SVP.

¶ 56    As to respondent's allegations that Dr. Smith used an incorrect reference group and misleading calculations when he used the Static-99R to assess respondent's risk of reoffending, we are not persuaded.  Even if any error occurred (and we do not find that it did), ample other evidence in the reexamination report supported Dr. Smith's conclusion that respondent was still an SVP.  As we have noted, independent of Dr. Smith's risk calculation based upon the results of the Static-99R, he also listed seven additional empirical risk factors that applied to respondent.[2] Those factors, in addition to respondent's admission in September 2013 that he rated his ability to control his deviant sexual urges as only 5 out of 10, are compelling evidence that respondent's

---

[2] Again, the empirical risk factors were intimate relationship conflicts, any deviant sexual interest, sexual interests with children, any paraphilic interests, employment instability, any substance abuse, and identification with children.

mental disorders made it substantially probable that he will engage in future acts of sexual violence.

¶ 57    As to Dr. Smith's "double counting" of risk factors, respondent does not provide any support for the proposition that both listing these factors as empirical risk factors and using these factors to support the diagnoses of respondent's mental disorders was improper.  Finally, Dr. Smith did not rule out substance abuse as a mental disorder.  Instead, he ascribed a "rule-out" diagnosis of cannabis-use disorder, because he needed more information in order to make a definitive diagnosis.

¶ 58    Here, overwhelming evidence established that respondent was still an SVP.  Specifically, he was still in phase two out of five phases in his sex-offender treatment program, and in February 2013 he left that program in order to address his "treatment barriers."  In January 2013 respondent referred to his criminal history as "no big deal," because it primarily involved obscene telephone calls.  In April 2013 it was noted in an IDHS report that respondent "had a very minimal understanding of treatment concepts" and it was recommended that he start the group therapy again.  Also, respondent admitted to Dr. Smith in September 2013 that he masturbated around four times a month to deviant sexual fantasies involving sex acts with children.  Even more disturbing, at the same time, respondent rated his ability to control his deviant urges at only 5 out of 10.  For all these reasons, the trial court did not err in finding that no probable cause existed to warrant an evidentiary hearing on the issue of whether respondent was still an SVP.

¶ 59                                III.  CONCLUSION

¶ 60    In sum, we find that the trial court did not abuse its discretion in denying respondent's motion for an independent examiner, as he failed to demonstrate that such an appointment was

crucial to his defense.  Also, the trial court properly found that no probable cause existed to warrant an evidentiary hearing, as there was overwhelming evidence that respondent continued to be an SVP.  Accordingly, the judgment of the circuit court of Lee County is affirmed.

¶ 61    Affirmed.