# Illinois Official Reports

## Appellate Court

---

*In re Commitment of Tittelbach*, 2018 IL App (2d) 170304

---

| | |
|---|---|
| Appellate Court Caption | *In re* COMMITMENT OF JOHN TITTELBACH (The People of the State of Illinois, Petitioner-Appellee, v. John Tittelbach, Respondent-Appellant). |
| District & No. | Second District<br>Docket No. 2-17-0304 |
| Rule 23 order filed<br>Motion to<br>publish allowed<br>Opinion filed | February 1, 2018<br><br>November 14, 2018<br>November 14, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 99-MR-285; the Hon. Paul M. Fullerton, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | William G. Worobec, of Wheaton, for appellant.<br><br>Lisa Madigan, Attorney General, of Chicago (David L. Franklin, Solicitor General, and Michael M. Glick, and Michael L. Cebula, Assistant Attorneys General, of counsel), for the People. |

Panel            JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Presiding Justice Hudson and Justice Spence concurred in the judgment and opinion.

**OPINION**

¶ 1       Respondent, John Tittelbach, appeals the judgment of the circuit court of Du Page County, granting the State's motion under section 65(b)(1) of the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/65(b)(1) (West 2016)) and holding that there was no probable cause for an evidentiary hearing on whether he was no longer a sexually violent person (SVP) (see *id.*). We affirm.

¶ 2                         I. BACKGROUND

¶ 3       In 1980, respondent pleaded guilty to two counts of indecent liberties with a child (Ill. Rev. Stat. 1979, ch. 38, ¶ 11-4(a)), specifically with his stepdaughters. He was sentenced to four years' probation. In 1997, he was convicted of criminal sexual assault (720 ILCS 5/12-13(a)(3) (West 1994)) of his girlfriend's minor daughter and was sentenced to four years' imprisonment.

¶ 4       On October 1, 1999, shortly after being released from prison, respondent was adjudicated an SVP and committed. At all pertinent times, the Act has defined an SVP as "a person who has been convicted of a sexually violent offense *** and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 1998). Respondent appealed the judgment. This court affirmed. *In re Detention of Tittlebach*, 324 Ill. App. 3d 6 (2001).

¶ 5       On January 22, 2010, respondent petitioned for conditional release under section 60 of the Act (725 ILCS 207/60 (West 2010)). On March 29, 2012, based on testimony from clinical psychologist David Suire, the court denied the petition. In 2013, this court affirmed. *In re Commitment of Tittelbach*, 2013 IL App (2d) 120463-U, ¶ 36.

¶ 6       Meanwhile, on July 3, 2012, the State moved to continue respondent's commitment, based on Suire's recent report. The trial court granted the motion on July 24, 2012. Respondent did not appeal.

¶ 7       On June 24, 2013, the State moved for a finding of no probable cause to believe that respondent was no longer an SVP. On November 4, 2013, before any hearing on the State's motion, respondent filed a petition (see 735 ILCS 5/2-1401 (West 2012)) to vacate the judgment of July 24, 2012. The trial court denied the petition. On appeal, we affirmed. *In re Commitment of Tittelbach*, 2015 IL App (2d) 140392.

¶ 8       On June 27, 2014, the State moved for a finding of no probable cause, based on Suire's reexamination report of June 18, 2014. In his report, Suire opined that respondent had not made sufficient progress in treatment to be conditionally released and that his condition had not so changed since the most recent periodic reexamination that he was no longer an SVP (see 725 ILCS 207/55(b) (West 2016)). Suire diagnosed respondent with pedophilic disorder, alcohol use disorder, and other specified personality disorder with antisocial and narcissistic

features. He noted that respondent had continued to refuse treatment. As to actuarial risk-assessment tests, respondent scored in the moderate-to-high-risk range on the Static-99, the low-risk range on the Static-99R, and the moderate-risk range on the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R). However, these measures did not consider other applicable risk factors, such as hostility, substance abuse, and attitudes tolerant of sex crimes. Of the three possible protective factors, two—progress in completion of treatment and a serious and debilitating medical condition—had no application. The third factor, increased age, "suggest[ed] some reduction in sexual recidivism risk," as respondent was now 67. However, it was not clear to what degree this factor applied or even that, if it did, it would reduce respondent's risk level to less than "substantially probable." Therefore, "[a]t this point," Suire did not believe that age was "an adequate protective factor" for respondent.

¶ 9    On December 22, 2014, on respondent's motion, the trial court appointed Dr. Luis Rosell to examine him.

¶ 10    On February 11, 2015, Suire filed a reexamination report, based in part on his interview of respondent on January 28, 2015. As pertinent here, Suire's report stated as follows. Respondent had not entered sex-offender treatment in the previous year and had expressed no documented interest in doing so. During the interview, respondent said that he did not believe that undergoing treatment would enable him to be released. He said that he had not felt attracted to his victims in a sexual way; even had he been sexually attracted to children in the past, he no longer was.

¶ 11    Suire's diagnoses of respondent remained unchanged from his previous report. As to the actuarial tests, respondent was in the moderate-to-high-risk range on the Static-99, the low-risk range on the Static-99R, and the moderate-risk range on the MnSOST-R. As before, Suire stated that these tests understated respondent's risk by omitting several factors that applied to him. Suire's conclusions and recommendations were the same as previously.

¶ 12    On April 14, 2015, respondent waived any hearing based on the 2014 periodic reexamination report. On December 2, 2015, Rosell filed his report, based in part on his evaluation of respondent on April 7, 2015. On February 16, 2016, the State moved for a finding of no probable cause, submitting Suire's report of February 10, 2016. We summarize Suire's report, then Rosell's report.

¶ 13    As pertinent here, Suire's report stated as follows. He had asked to meet with respondent on February 5, 2016, but respondent had declined. Respondent had not entered sex-offender-specific treatment in the previous year or expressed any documented interest in doing so. Suire's diagnoses of respondent were unchanged from the most recent report.

¶ 14    As to the actuarial tests, Suire noted that, on the Static-99R, respondent scored in the low-risk range[1]; on the MnSOST-R, he scored in the moderate-risk range. As in previous reports, Suire stated that the actuarial tests underestimated respondent's risk of reoffending, in that they failed to consider numerous factors. Further, Suire stated, respondent's "actual sex offending history, as distinct from *** his criminal history, [was] essentially continuous for over a quarter century," suggesting "very powerful and enduring urges related to sexual contact with underage females." Thus, in Suire's opinion, respondent was "substantially probable to commit a new sexual offense." Suire opined that none of the three protective

---

[1]Suire's report noted that the developers of the Static-99 now recommended that the revised edition, developed in 2009, be used in preference to the original.

- 3 -

factors applied. The first two, progress in treatment and a serious and debilitating medical condition, he rejected summarily. The third factor, increased age, received more discussion. As in his previous report, Suire concluded that respondent's age, now 68, "suggest[ed] some reduction in sexual recidivism risk" but that it was not clear to what degree this factor applied to respondent or, even if it did, whether it would reduce his risk level to less than "substantially probable." Suire thus opined, "[a]t this point *** age is [not] an adequate protective factor" for respondent.

¶ 15    Suire's report reached the same conclusions as his prior report. First, despite respondent's relatively low scores on the actuarial tests, it was substantially probable that he would engage in future acts of sexual violence. Second, having participated in no sex-offender treatment in the past year, respondent had not lowered his risk based on progress in treatment, and he remained in need of treatment in a secure facility. Suire stated that, to a reasonable degree of psychological certainty, (1) respondent had not made sufficient progress in treatment to be conditionally released and (2) respondent's condition had not so changed since the previous reexamination that he was no longer an SVP.

¶ 16    We turn to Rosell's report, which, as pertinent here, stated as follows. In his interview, respondent expressed remorse for his crimes and said that he prayed that his victims would forgive him. He also stated that, in 1999, he participated in nine months' orientation to treatment but was told that he had to undergo a plethysmograph examination before he could enter treatment; he refused and had not been involved in treatment since. Respondent said that he felt that the plethysmograph examination would not prove anything and that treatment did not enable people to get released. Asked to rate his risk of reoffending on a scale of 0 to 10, respondent gave himself a 1; he had come to understand how he had hurt other people and himself. Respondent did not consider himself a pedophile, but he acknowledged that the accepted psychological definition might apply.

¶ 17    Rosell's report turned to Suire's diagnoses of respondent. Rosell stated that, generally, a clinical diagnosis of a mental disorder does not imply that the individual meets a given legal standard. Even with pedophilic disorder, "it is not clear what percentage of individuals who are sexually attracted to children *** actually act on those attractions. With regards to DSM-5 [(American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, DSM-5 (2013))], a pedophilic disorder would only be a conclusion and is not predictive."

¶ 18    Rosell agreed with Suire that respondent met the criteria for pedophilic disorder, nonexclusive type, attracted to females. However, he continued, various "other elements"—such as guilt, shame, intense sexual frustration, or feelings of isolation—can change over time without treatment. Thus, "the course of pedophilic disorder may fluctuate, increase, or decrease with age." In respondent's case, based on his "age and lack [of] interest in any sexual behavior[,] it would be difficult to make the argument pedophilia is not diminished."

¶ 19    Under the rubric of assessing risk, Rosell's report stated as follows. On the Static-99R, which took better account than had the Static-99 of the effect of age on recidivism, respondent scored 0. On the Static-2002R, he also scored 0. On the Multisample Age-Stratified Table of Sexual Recidivism Rates (MATS-1), he scored a 3, placing him in the medium range of risk. Rosell noted further that respondent was currently 67 and had not committed a "hands-on sexually violent offense" in 20 years. Rosell noted numerous studies showing that increasing

- 4 -

age correlates with decreasing recidivism. He concluded, "Based on [respondent's] current status, the risk percentage is much lower than the statutory threshold regardless [of] what study or interpretation of the instrument is utilized."

¶ 20    Rosell's report provided the following conclusions. "Based on his actuarials [(test results)]," respondent scored in "the low range with very low corresponding risk percentages that reflect a lack of probability of future sexual offending." Rosell based this conclusion not only on respondent's age but also on "his intrafamilial offending and lack of criminal history." Thus, Rosell opined to a reasonable degree of psychological certainty that, although respondent was still an SVP, he did not currently pose "a serious risk of sexual violence" and was "appropriate for discharge."

¶ 21    On May 31, 2016, the trial court held the probable cause hearing. The State argued as follows. Section 55(a) of the Act, as then written, required a report at least yearly on (1) whether respondent had made "sufficient progress *in treatment* to be conditionally released" and (2) whether his condition had so changed since the most recent periodic reexamination that he was no longer an SVP. (Emphasis added.) 725 ILCS 207/55(a) (West 2016). Suire's report correctly concluded that the answer to the first inquiry was negative because respondent had not undergone any treatment since the previous reexamination—or, indeed, since he was originally committed, in 1999. More generally, nothing had changed since the previous reexamination. Both reporting experts diagnosed respondent with pedophilic disorder.

¶ 22    Respondent argued as follows. The applicable version of section 55(a) was the one that had been in effect when he was originally committed. At that time, before revisions in 2012, section 55(a) did not contain the words "in treatment," so the first question for the evaluators was whether he had made "sufficient progress to be conditionally released." 725 ILCS 207/55(a) (West 2010). Thus, the lack of treatment was not dispositive. Further, respondent had not petitioned for conditional release; thus, under section 65(b)(1) of the Act, the purpose of the hearing was "to determine whether facts exist[ed] to believe that since the most recent periodic reexamination *** the condition of [respondent] ha[d] so changed" that he was no longer an SVP. 725 ILCS 207/65(b)(1) (West 2016). Respondent contended that this requirement set a low threshold, which he could satisfy by producing plausible evidence of a change in his circumstances or in professional knowledge, methods, or theories relating to the risk of recidivism. Contending that his case was comparable to *In re Commitment of Wilcoxen*, 2016 IL App (3d) 140359, respondent argued that he had met the statutory threshold: Rosell had stated that respondent's increased age militated against the probability of recidivism, and respondent's very low scores on the actuarial tests were to the same effect. Thus, he contended, he was entitled to a full discharge hearing.

¶ 23    The State replied that respondent had never been in treatment, so his arguments lacked support from a provider who could attest to any progress he had made. Rosell had acknowledged that respondent suffered from pedophilic disorder. His statement that respondent had not committed a hands-on sexual offense since his commitment meant little, given that respondent had not been exposed to young females in that period and no treatment records supported finding a change in his condition. There had been no progress; nothing had changed since the previous reexamination report. Thus, there was no probable cause.

¶ 24    The trial court granted the State's motion. The judge explained as follows. Whether the case was governed by the pre-2012 version of section 55(a) or by the current version made no

real difference; "there has been no progress whatsoever." The judge distinguished *Wilcoxen*, in which the appellate court had reversed the denial of an order finding no probable cause. There, the court had relied heavily on evidence that the respondent had had three years of treatment in which he had participated willingly and actively.

¶ 25    Respondent moved to reconsider. The trial court denied his motion. He timely appealed.

¶ 26                                    II. ANALYSIS

¶ 27    On appeal, respondent contends that the judgment finding no probable cause must be reversed, because he produced sufficient evidence to entitle him to a hearing on whether his condition had so changed since the most recent periodic reexamination that he was no longer an SVP.

¶ 28    Our review is *de novo*. *In re Commitment of Kirst*, 2015 IL App (2d) 140532, ¶ 49. At a postcommitment probable-cause hearing, the trial court must determine whether facts exist to warrant a hearing on whether the respondent is no longer an SVP. *In re Detention of Stanbridge*, 2012 IL 112337, ¶ 51. Thus, we must decide whether respondent met this threshold.

¶ 29    We note first what is *not* directly at issue in this appeal. First, we are not primarily (if at all) concerned with whether, since the most recent periodic reexamination, respondent made sufficient progress in treatment (or regardless of treatment) to be conditionally released. See 725 ILCS 207/55(a)(1) (West 2016). This question might have arisen had respondent petitioned for conditional release (see *id.* § 60). But he did not do so. Thus, the hearing was limited to the evidence of whether, since the previous reexamination, his condition had so changed that he was no longer an SVP. See *id.* § 65(b)(1).

¶ 30    Second, although respondent contends in part that the trial court overemphasized his status in treatment, we need not address this matter separately. On *de novo* review, we decide the correctness of the court's judgment, not its reasoning. See *Tittelbach*, 2015 IL App (2d) 140392, ¶ 23. Thus, we shall simply consider anew whether respondent met the probable-cause threshold. If not, we must affirm the trial court even if it reasoned imperfectly; if so, we must reverse the trial court, even if it did not unduly stress respondent's treatment history.

¶ 31    Third, we review the judgment on appeal, but we must accept any prior judgment that found that respondent was an SVP. Specifically, we must accept that, in its 2012 ruling, the trial court correctly held that there was no probable cause to believe that respondent was no longer an SVP. Furthermore, as he waived any probable cause hearing based on the 2014 and 2015 reexamination reports, we must accept that, at least as of February 2015, there was no probable cause to believe that he was no longer an SVP. Respondent's reliance on Rosell's report must be viewed in light of this limitation. Rosell's report must be considered not precisely as evidence of whether respondent was an SVP or had ever been an SVP, but only as evidence of whether, since the previous reexamination report that stated that *he was an SVP* as of the date of the report, his condition had *changed so substantially* that he was no longer an SVP. See *In re Commitment of Smego*, 2017 IL App (2d) 160335, ¶ 24 (validity of original finding that respondent was an SVP is not at issue in postcommitment hearing). This restriction is required not only by the finality of judgments but also by section 65(b)(1) of the Act, which plainly limits the trial court's inquiry to the change in the committed person's condition "since the most recent periodic reexamination." 725 ILCS 207/65(b)(1) (West 2016).

- 6 -

¶ 32     We turn to the issue on appeal. As pertinent here, again, the Act defines an SVP as a person who (1) has a mental disorder and (2) is dangerous to others because his mental disorder creates a substantial probability that he will engage in acts of sexual violence. *Id.* § 15(b)(4), (b)(5). At the hearing, there was no dispute over the first factor: both psychologists stated that respondent suffered from pedophilic disorder (and two other pertinent mental disorders). Respondent does not dispute the existence of his disorder. Insofar as he has claimed any change in its severity, that is pertinent to the second factor.

¶ 33     As to the second factor, we reiterate that we are bound by the conclusion in Suire's February 2015 report that, as of that time, it was substantially probable that respondent would engage in acts of sexual violence. Thus, we are concerned with what evidence there was that, since then, respondent's condition had so changed as to negate this substantial probability. There were two possible sources of such evidence: Suire's report and Rosell's report. We conclude that neither report provided sufficient evidence.

¶ 34     First, Suire's report offered nothing to show a change in respondent's condition since the previous report. On respondent's likelihood of reoffending, Suire reached the same conclusion as before. Moreover, he relied on similar reasons: in 2016, Suire reported that respondent had refused to enter sex-offender-specific treatment in the previous year, just as he had refused to do as of February 2015. Although the hearing was not primarily concerned with whether respondent had made substantial progress in treatment in the preceding year, the undisputed fact that he had not done so eliminated the most likely ground for finding that his condition had changed. And, though Suire no longer relied on respondent's score on the Static-99, he stated that respondent's scores on the Static-99R and MnSOST-R placed him in the same risk categories as before—and that, as before, these tests seriously underestimated his risk.

¶ 35     Respondent does not contend that Suire's report could have satisfied his burden at the hearing. Thus, he relies on Rosell's report. Respondent cites three aspects of the report that, he asserts, raised a fair question as to a change in his condition. We conclude that these purported grounds, singly or collectively, did not suffice to entitle respondent to a full evidentiary hearing on whether, since the most recent periodic reexamination, his condition had so changed that he was no longer an SVP.

¶ 36     First, respondent asserts that, although he was not currently in treatment, he had participated in treatment in the past. But the sole "treatment" that he cites is the nine months' orientation that he underwent in 1999. Leaving aside the dubious assumption that orientation is treatment, respondent's actions 17 years before the hearing were completely irrelevant to whether his condition had changed in the period since the most recent reexamination.

¶ 37     Second, respondent notes Rosell's discussion of how respondent had taken ownership of his sexual offenses and expressed remorse. But respondent's expressions of remorse, even if taken at face value, established little about any recent change in his condition. He told Rosell that he did not consider himself a pedophile. Further, respondent had made some similar acknowledgments of responsibility in prior interviews with Suire, but Suire had concluded that he was still an SVP, and the correctness of that conclusion is not open to review.

¶ 38     Third, respondent emphasizes that Rosell reported that he scored in the low-risk range on two actuarial tests and in the medium-risk range on a third and that Rosell opined, based on studies, that recidivism risk declines significantly with advancing age. However, although this evidence is potentially meaningful, it does not require a finding of probable cause, even considering that that is not a high threshold. First, Suire also scored respondent relatively low

on the actuarial tests, but he stated that the results underestimated respondent's risk because the tests did not consider a number of important risk-increasing factors. Notably, Rosell's report did not attempt to rebut this critique, at least not directly. Second, respondent's relatively low scores on the actuarial tests were not a new development; his scores on the Static-99R and the MnSOST-R placed him in the same risk categories as had the scores in the previous report.

¶ 39    Finally, although respondent was approximately one year older than he had been at the time of the previous report, this was not sufficient to show a change in his condition. Since respondent was unfit for discharge at age 67, it was implausible that, other things being equal, he was fit at age 68. Even granting that there is a linear relationship between increasing age and decreasing risk, and that at some point respondent's age alone might mean that he is no longer a substantial threat to reoffend, we see no reason to suspect that the year between 2015 and 2016 was the proverbial straw that broke the camel's back.

¶ 40    Respondent's reliance on *Wilcoxen* is unavailing. We have examined his case on its own unique facts and concluded that they do not call for a full discharge hearing. In any event, however, *Wilcoxen* differs from this case. There, the court emphasized that, since the previous reexamination, the respondent had participated in treatment actively and productively for nearly three years, completing the first phase of the program and numerous courses in the second phase. *Wilcoxen*, 2016 IL App (3d) 140359, ¶¶ 39, 41. Here, respondent participated in no treatment. Moreover, it appears that, in *Wilcoxen*, the actuarial tests, in both their results and their interpretations, and the respondent's self-reporting represented a greater change from the circumstances reported in the most recent periodic reexamination than did those factors in this case.

¶ 41                                III. CONCLUSION
¶ 42    The judgment of the circuit court of Du Page County is affirmed.

¶ 43    Affirmed.