2026 IL App (2d) 250237-U
No. 2-25-0237
Order filed June 4, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS
SECOND DISTRICT

*In re* COMMITMENT OF JAMES BICE

(The People of the State of Illinois, Petitioner-Appellee, v. James Bice, Respondent-Appellant).

Appeal from the Circuit Court of Lake County.
Honorable Ari P. Fisz, Judge, Presiding.
No. 00-MR-1076

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice Kennedy and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court did not err in denying respondent an evidentiary hearing on whether probable caused existed to believe that he remained a sexually violent person as defined by the Sexually Violent Persons Commitment Act. Respondent did not establish any changed circumstances since the last probable cause hearing that might plausibly suggest he was no longer predisposed toward sexual violence.

¶ 2   In 2010, a trial court adjudicated respondent, James Bice, a sexually violent person (SVP) as defined by the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2010)) and ordered him committed to the custody of the Department of Human Services (DHS) until he was no longer an SVP. Respondent now appeals an order holding that he failed to show probable cause to believe that he is no longer an SVP and, accordingly, denying him a discharge hearing. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                 A. Initial Commitment

¶ 5     Respondent was born in 1982. On December 21, 2000, the State petitioned to adjudicate him an SVP and commit him to DHS. The cause was continued numerous times.

¶ 6     On March 9, 2010, the parties stipulated to the following factual basis for commitment. On January 29, 1996, respondent was adjudicated delinquent based on his 1995 aggravated criminal sexual abuse of his three-year-old half-sister, and he was committed to the Juvenile Department of Corrections (JDOC). Previously, respondent had committed other offenses: (1) sexually fondling his 6-year-old and 8-year-old cousins when he was approximately 10 years old, (2) fondling the vagina of an 8-year-old girl, and (3) exposing his penis to 14 children between the ages of 2 and 13. (In addition to this specific misconduct, the stipulation noted: "Respondent has admitted to sexual behaviors with seventeen (17) children.") In January 1997, respondent was paroled to a residential sexual-offender treatment facility. He engaged in sexually inappropriate behaviors with other residents and, in October 1997, was discharged unsuccessfully and returned to the JDOC. In 1998, respondent was paroled to a different residential sexual-offender facility, but he engaged in sexual misconduct with two roommates and was discharged and returned to the JDOC.

¶ 7     The stipulation continued as follows. If called at a trial, Dr. Agnes Jonas would testify that respondent suffered from pedophilia and borderline personality disorder. Dr. Paul Heaton would testify that respondent suffered from paraphilia and borderline personality disorder with antisocial traits. Both experts would testify that (1) respondent suffered from mental disorders as defined by the Act and that these mental disorders "seriously affect[ed] [his] emotional or volitional capacity and predispose[d] him to engage in acts of sexual violence" and (2) these mental disorders

"cause[d] [r]espondent serious difficulty in controlling his deviant and or sexual behavior." Respondent would testify that he suffered from borderline personality disorder.

¶ 8    On March 9, 2010, the trial court entered an agreed order adjudging respondent an SVP and committing him to DHS until he was no longer an SVP. In succeeding years, respondent was regularly readjudicated an SVP. See *In re Commitment of Bice*, 2019 IL App (2d) 180432-U, ¶¶ 6-26; *In re Commitment of Bice*, 2018 IL App (2d) 170148, ¶¶ 10-40.

¶ 9                            B. Conditional Release and Recommitment

¶ 10    On March 6, 2020, the trial court placed respondent on conditional release. On July 11, 2022, the State petitioned to revoke his conditional release, alleging that he had violated conditions prohibiting him from possessing pornography and limiting his Internet access. The violation report disclosed that, on July 11, 2002, two "[a]gent[s] *** conduct[ed] a field visit" with respondent. The agents searched respondent's phone and found pornographic images. Respondent told the agents that he had been using the free Wi-Fi on the bus to access the Internet for music and pornography. He downloaded images from pornographic websites and attempted unsuccessfully to download pornographic videos. Respondent had "many subfolders" stored on his phone. He said that he downloaded the images "because did not think he would be caught." Police officers took respondent into custody and examined the images. "The [police] forensics report did not indicate a specific number of images, but [it] was well over 1,100 images of depicted sexual scenes with young looking participants." However, felony charges were not approved.

¶ 11    On October 21, 2022, the parties stipulated that respondent had violated the conditions of his release, and the trial court revoked his conditional release. Respondent was returned to a treatment facility.

¶ 12                              C. 2023 Probable Cause Hearing

¶ 13    On October 6, 2023, Dr. Amy S. Louck Davis, Psy.D., reported on respondent's latest annual psychological reexamination. As pertinent here, she stated as follows.

¶ 14    After his conditional release ended, respondent began sex-offense-specific treatment. During his interview on October 5, 2023, respondent told Louck Davis that his pornography-related violation of conditional release was " 'a one time situation' "—" '[i]t was less than a minute on the phone' " and did not involve child pornography. Respondent claimed that he did not " 'really have any [sexual] functioning' " and could go back on conditional release immediately with success.

¶ 15    Louck Davis reported that respondent met the diagnostic criteria for (1) "Unspecified Paraphilic Disorder" (UPD) and (2) "Other Specified Personality Disorder, Borderline, Schizoid, and Antisocial Traits" (OSPD). Both disorders, in Louck Davis's opinion, qualified as mental disorders under the Act because they predisposed respondent to commit acts of sexual violence. Louck Davis diagnosed with respondent with UPD because he perpetrated sexual offenses against younger peers when he was under 16, engaged in sexual behavior in secure institutional and detention settings, engaged in voyeurism and exhibitionism, and described "problematic sexual attitudes and beliefs." However, since turning 16, respondent had not engaged in sexual behavior with peers at least five years younger. She added that respondent

> "ha[d] not demonstrated a pattern of sexual arousal to nonconsenting individuals (necessary criteria for a diagnosis of Other Specified Paraphilic Disorder due to arousal to non-consent), nor established patterns of behavior and arousal to voyeuristic or exhibitionistic criteria necessary for those disorders. Nonetheless, the problematic, illegal,

and rule-violating sexual behaviors [respondent] has perpetrated have culminated in decades of special needs, negative impact on his functioning, and institutionalization."

¶ 16 Respondent's OSPD was marked by several traits. First, he had borderline personality disorder marked by (1) long-term identity disturbance in that he was easily influenced by others, although he had made a "concerted effort in treatment and on his own" to gain "a more solid sense of self," including "[r]ecent exploration of his gender identity"; (2) impulsivity in a variety of contexts, though this had improved; and (3) "numerous events" of suicidal or self-injurious behavior, though this also had improved in recent years. Second, respondent had schizotypal personality disorder marked by (1) "unusual beliefs and distorted cognitions" that were "inconsistent with subcultural norms" and influenced his behavior; (2) "[o]dd thinking and speech"; (3) "[c]onstricted affect," *i.e.*, "not showing emotional flexibility or range of expression"; and (4) "odd behavior" that drew attention to himself. However, as to (4), respondent had shown improvement, especially in the last two years. Third, respondent had antisocial personality disorder evidenced by (1) arrests for a sexually violent offense and a physically violent offense, and numerous violations of disciplinary rules while confined; (2) deceitfulness for personal gain or amusement, although he had improved here; (3) lack of remorse for his transgressions; and (4) a "documented history of Conduct Disorder and Oppositional Defiant Disorder prior to age 15."

¶ 17 Under the section "Issue of Risk," Louck Davis noted, "[T]here currently are no actuarial risk assessment instruments appropriate and ethical for use with individuals who were charged or convicted/adjudicated *only* of sexual assaults that occurred prior to age 17." (Emphasis in original.) Therefore, she used "structural clinical judgment" to estimate respondent's risk of recidivism, relying on recent research, respondent's history, and his interview.

¶ 18    Louck Davis stated:

"Research regarding recidivism of sexual offending for those who sexually offended prior to age 17 has provided some basic guidelines relative to considering risk. Recidivism rates for juveniles who commit sexual offenses are generally lower than those observed for adult sexual offenders. Currently, the reported *average* risk for re-offense for someone who committed sexual offenses as a juvenile is estimated to be 5%." (Emphasis in original.)

¶ 19    Louck Davis continued as follows. In lieu of established actuarial risk-assessment tools, she used the Sexual Violence Risk-20 (SVR-20), a 20-factor checklist. The following factors placed respondent at a "High" risk to reoffend: (1) he had sexual health problems, (2) he was a victim of child abuse, (3) he had relationship problems, (4) he had employment problems, (5) he had committed nonsexual offenses, and (6) he had negative attitudes toward supervision. The following factors placed him at a "Moderate" risk to reoffend: (1) sexual deviation, (2) diverse sexual offending, and (3) "Lack[ing] Realistic Plans." In two categories—sexual health problems and negative attitudes toward supervision—respondent's level of risk had recently increased.

¶ 20    Louck Davis identified three protective factors, which she determined did not apply to respondent: (1) sex-offense-specific treatment (respondent's treatment was ongoing and there was still progress to make), (2) medical condition (respondent had none that might reduce his risk to reoffend), and (3) age (respondent was just over 40 years old).

¶ 21    Louck Davis noted the gradations for recidivism risk: "Very Low," "Below Average," "Average," "Above Average," and "Well Above Average" (emphases omitted). She continued:

"[Respondent] previously was broadly estimated to have an Above Average level of risk for re-offense. The average rate of sexual recidivism for those who committed

- 6 -

sexual offenses as juveniles is currently estimated at 5% ***. Based on consideration of empirical and theoretical risk factors present for [respondent], he is currently estimated to have increased risk based on the rule-violating behavior on [c]onditional [r]elease. This increased risk is noteworthy in terms of important risk factors, specifically Sexual Health Problems and Negative Attitudes Toward Supervision.

Without specific actuarial measures appropriate to provide a more specific estimate, [respondent] is regarded as having an Above Average range of risk at present."

¶ 22 Louck Davis concluded that, to a reasonable degree of psychological certainty, respondent suffered from UPD, OSPD, post-traumatic stress disorder, and attention deficit/hyperactivity disorder. Only the first two were within the Act's definition of mental disorders. Because of his increased risk factors—sexual health problems and negative attitudes toward supervision—respondent was not suited to conditional release. Respondent's condition had not significantly changed since the last reexamination, and he remained an SVP under the Act.

¶ 23 Based on the report, the trial court found no probable cause to believe that respondent was no longer an SVP. Therefore, the court denied respondent an evidentiary hearing on whether he was no longer an SVP.

¶ 24                               D. 2024 Probable Cause Hearing

¶ 25 On September 9, 2024, Louck Davis examined respondent. On October 6, 2024, she released her report. On November 1, 2024, based on Louck Davis's report, the State moved for a finding of no probable cause to believe that respondent was no longer an SVP. In her report, Louck Davis stated that, since her last report, respondent had completed several therapy groups. However, he often used time in these groups to discuss his gender identity, including his "desires to receive surgery to become an intersexed individual" and his "frustration *** for perceived

delays in such treatment." These discussions had "significantly delayed [respondent's] *** progress in processing and taking responsibility for" his behavior on conditional release. Also, he tended to support "others' anti-treatment beliefs and attitudes [and] his own views regarding the treatment program assignments and its ineffectiveness." However, respondent did consistently attend therapy and recreation groups.

¶ 26 Louck Davis reiterated the observations she had made in her 2023 report relating to respondent's discussions of his gender identity, his negative comments about treatment, and his agreement with others' anti-treatment beliefs.

¶ 27 Louck Davis stated that, in the interview, respondent said:

" 'I have already dealt with what I have to deal with. I know who I am and I know how I am and I know what I did and why I did it. I don't need no cycle [treatment plan] to tell me why I did what I did ***. I don't need a little circle to tell me. I don't need a group to tell me. I know. I lived it. All that group does is try to force you into their box. And try to compel you into their understanding *** of the cycle of yesterday, rather than the understanding of who you are today. Because there is nothing of that 13 year old kid [left]. What in your 13 year old self would you do today?' "

¶ 28 Louck Davis again diagnosed respondent with UPD and OSPD. The bases for these diagnoses were the same as in her 2023 report. As in her 2023 report, she noted that respondent did not meet the criteria for "Other Specified Paraphilic Disorder" because he did not show sexual arousal to nonconsenting individuals. She noted continuing improvements as to OSPD in the areas of identity disturbance, impulsivity, deceitfulness, and odd behavior.

¶ 29 Under "Issue of Risk," Louck Davis wrote as follows. Of the 20 risk factors, the following factors placed respondent at a "High" risk to reoffend: (1) sexual health problems, with a recent

increase in risk, (2) victim of child abuse, (3) relationship problems, (4) employment problems, (5) nonsexual offending, and (6) negative attitudes toward supervision, with a recent increase in risk. The following factors placed respondent at a "Moderate" risk to offend: (1) sexual deviation, (2) diverse sexual offending, and (3) "Lack[ing] Realistic Plans." Louck Davis stated that respondent had an "increased risk based on rule-violating behavior on Conditional Release. This increased risk [was] noteworthy in terms of important risk factors, specifically Sexual Health Problems and Negative Attitudes Toward Supervision." As in 2023, none of the protective factors applied to respondent. Louck Davis opined that respondent's condition had not significantly improved and that he remained an SVP.

¶ 30    In response to the State's motion, respondent maintained that he had met the probable cause threshold. As to the existence of a qualifying mental disorder under the Act, he argued that, even if UPD and OSPD qualified as mental disorders according to psychologists, they did not necessarily meet the definition of a mental disorder under the Act. He noted that the facts on which Louck Davis relied for her diagnosis of UPD were primarily from respondent's youth and that, as an adult, he had not demonstrated "diagnostically significant" pedophilic behavior or "patterns of voyeurism, exhibitionism, or sexual arousal to non-consenting individuals." Respondent argued that Louck Davis based her diagnosis of paraphilia on "profoundly circular reasoning": after "identifying several inapplicable paraphilic disorders," she cited respondent's July 2022 conditional-release violations and concluded that, because his long-time civil commitment had caused psychological difficulties, he suffered from a mental disorder that justified continuing his commitment. Respondent reasoned further that, when he was first committed, "the extraordinarily low recidivism rates for juvenile sex offenders [were] not understood by the psychological and

legal community"; thus, the fact of his original commitment and its continuation did not support the diagnosis, as the science had changed.

¶ 31    As to OSPD, respondent argued that Louck Davis's diagnosis was based primarily on respondent's juvenile record.  Even if the diagnosis was proper under psychological criteria, that did not prove that "the mental disorder so impair[ed] [respondent's] current level of functioning that it [was] substantially probable" that he would commit a sexually violent offense.  Further, Louck Davis's discussion of OSPD was "replete with evidence of recovery."  There was no evidence that respondent "committed [any] recent rule violations in an institutional setting" and no evidence of "current deviant sexual interest."  These absences cut against finding that respondent's personality disorders impaired his volitional control (see 725 ILCS 207/5(b), (f) (West 2022)).

¶ 32    As to the issue of recidivism risk, respondent emphasized that, as Louck Davis granted, "the baseline sexual recidivism rate[s] for juvenile sex offenders [are] extraordinarily low."  Further, some factors in the SVR-20, such as employment problems and relationship problems, were ill-suited to the evaluation of one "who has been confined since he was 13 years old."

¶ 33    In reply, the State argued that the crucial issue was whether there had been any change in respondent's diagnoses or overall condition since the last reexamination report.  According to the State, Louck Davis's report supplied no basis for finding such a change.  Further, the State noted that respondent's rule violation while he was on conditional release in 2022 was substantial: even though felony charges were not brought, "[respondent's acts] [could] be seen as a sexually violent offense."  Although respondent had not been shown to have engaged in any prohibited sexually deviant behavior after he was returned to custody, his ability to access nonconsenting partners or pornography was extremely limited.

¶ 34 The State argued that the generally low rate of recidivism among offenders in respondent's situation did not establish that respondent himself was a low risk. Louck Davis had found that his level of risk was above average and that two risk factors had actually become stronger in the last year. Further, treatment was not a protective factor for respondent, and he had not completed his treatment cycle and saw no need to do so.

¶ 35 On May 21, 2025, the trial court found that there was no probable cause to warrant an evidentiary hearing on whether respondent was an SVP. He timely appealed.

¶ 36                                   II. ANALYSIS

¶ 37 On appeal, respondent argues that the trial court erred in finding that he did not establish probable cause to believe that he was no longer an SVP. On our *de novo* review (see *In re Commitment of Tittelbach*, 2018 IL App (2d) 170304, ¶ 28), we hold that the trial court did not err.

¶ 38 Under the Act, as pertinent here, a "sexually violent person" is one who has been convicted of a sexually violent offense "and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2022). A "mental disorder" is a "congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." *Id.* § 5(b). Respondent concedes that he has been convicted of a sexually violent offense.

¶ 39 As pertinent here, section 55(a) of the Act (*id.* § 55(a)) states:

"If a person has been committed *** and has not been discharged ***, [DHS] shall submit a written report to the [trial] court on his or her mental condition at least once every 12 months after an initial commitment *** for the purpose of determining whether[ ] *** the

person's condition has so changed since the most recent periodic reexamination *** that he or she is no longer [an SVP]."

¶ 40    As pertinent here, section 65(b)(1), (2) of the Act (*id.* § 65(b)(1),(2)) provides:

"(b)(1) If the person does not affirmatively waive the right to petition, the court shall set a probable cause hearing to determine whether facts exist to believe that since the most recent periodic reexamination ***, the condition of the committed person has so changed that he or she is no longer [an SVP].

(b)(2) If the court determines at the probable cause hearing *** that probable cause exists to believe that since the most recent periodic reexamination ***, the condition of the committed person has so changed that he or she is no longer [an SVP], then the court shall set a hearing on the issue. ***."

¶ 41    The probable cause hearing shall consist "only of a review of the reexamination reports and arguments on behalf of the parties." *Id.* § 65(b)(1). "[T]he court must consider the professional conclusions as to [the] respondent's status in the most recent report and any changed circumstances." *In re Commitment of Rendon*, 2017 IL App (1st) 153201, ¶ 23. The court must consider " 'all reasonable inferences that can be drawn from the facts in evidence' " to determine whether there is a " '*plausible account*' " that the respondent is no longer an SVP. (Emphasis in original.) *In re Detention of Hardin*, 238 Ill. 2d 33, 48 (2010) (quoting *State v. Watson,* 595 N.W.2d 403, 420 (Wis. 1999)). If the court finds probable cause, it shall set a hearing to decide whether the respondent is still an SVP. 725 ILCS 207/65(b)(2) (West 2022).

¶ 42    Respondent contends that there is a plausible basis to conclude that (1) he does not have a mental disorder and, alternatively, (2) his mental disorder does not qualify under the Act because it does not create a substantial probability that he will engage in acts of sexual violence. Either

conclusion, of course, would be sufficient to trigger a full evidentiary hearing. Essentially, respondent reiterates the arguments that he raised in the trial court. On the issue of a qualifying mental disorder under the Act, he asserts that (1) the diagnoses of UPD and OSPD did not establish any mental disorder under the Act because the diagnoses by themselves did not address whether they create a substantial probability of future acts of sexual violence (see *id.* § 5(f)); (2) the diagnoses rested almost entirely on his actions when he was a juvenile; (3) his July 2022 violation of his release conditions did not demonstrate a qualifying mental disorder; (4) Louck Davis's 2024 report did not disclose any basis for concluding that respondent suffered from paraphilia, a prerequisite for a diagnosis of UPD; and (5) there was no evidence that he violated any rule since the 2023 reexamination.

¶ 43    As to recidivism risk, respondent argues (as below) that, by Louck Davis's own admission, the risk of reoffending by juvenile sex offenders is extremely low and that several of the risk factors used in the SVR-20 have no rational application to a person who has been institutionalized or incarcerated since age 13.

¶ 44    The State responds in several ways. However, we find one argument dispositive and need not address the others. The State argues that respondent improperly seeks to relitigate the issues that were settled in the 2023 adjudication that found no probable cause. The State contends that respondent must accept that judgment as controlling and must instead seek to establish a plausible account that later-arising circumstances provided probable cause to believe that he was no longer an SVP. The State maintains that respondent did not establish that plausible account. We agree with the State.

¶ 45    The State's legal argument is solidly based on both the plain language of the Act and controlling case law. Section 55(a) of the Act requires a periodic reexamination "for the purpose

of determining whether *** *the person's condition has so changed since the most recent periodic reexamination* *** that he or she is no longer [an SVP]." (Emphasis added.) *Id.* § 55(a). Section 65(b)(1) states that that the probable cause hearing must determine "whether facts exist to believe that *since the most recent periodic reexamination* ***, the condition of the committed person has so changed that he or she is no longer [an SVP]." (Emphasis added.) *Id.* § 65(b)(1). Section 65(b)(2) states that the court must determine whether "probable cause exists to believe that *since the most recent periodic reexamination* ***, the condition of the committed person has so changed that he or she is no longer [an SVP]." (Emphasis added.) *Id.* § 65(b)(2).

¶ 46    The plain import of the language we have emphasized is that, at the probable cause hearing, the trial court's only obligation is to decide whether there is a plausible account of sufficiently changed circumstances since the most recent periodic reexamination. When statutory language is unambiguous, we must follow it. *Snyder v. Heidelberger*, 2011 IL 111052, ¶ 16. Therefore, most of what respondent argues, however valid it might be in theory, is simply not before us.

¶ 47    The case law is similarly compelling. In *In re Detention of Stanbridge*, 2012 IL 112337, ¶ 72, the supreme court stated that "the relevant inquiry must begin with the premise that the individual has been adjudicated in the past with a mental disorder that makes it substantially probable that he will reoffend" and that, "in postcommitment proceedings for discharge, the individual must present some plausible evidence that demonstrates a change in the circumstances that led to this finding."

> "Under the relevant statutory scheme, a change in circumstances could include a change in the committed person, a change in the professional knowledge and methods used to evaluate a person's mental disorder or risk of reoffending, or even a change in the legal

- 14 -

definitions of a mental disorder or a sexually violent person, such that a trier of fact could conclude that the person no longer meets the requisite elements." *Id.* However, a change in circumstances does not include a new expert opinion based on the reinterpretation of old evidence by old methods. *Id.* ¶ 71. As this court has stated, "[W]e review the judgment on appeal, but we must accept any prior judgment that found that [the person] was an SVP." *Tittelbach*, 2018 IL App (2d) 170304, ¶ 31; see also *Rendon*, 2017 IL App (1st) 153201, ¶ 23.

¶ 48    With the validity of the 2023 judgment not subject to relitigation, we proceed to whether respondent met the probable cause test. We agree with the State that he did not.

¶ 49    As we noted, *Stanbridge* sets out three types of possible changed circumstances: (1) changes in the person; (2) changes in professional knowledge or methodology; and (3) changes in the governing law. *Stanbridge*, 2012 IL 112337, ¶ 72. Here, the latter two of these may be speedily dismissed. Neither respondent nor Louck Davis presented any meaningful changes in professional knowledge or methodology since the 2023 reexamination. And the governing law did not change. That leaves only any changes in respondent himself between the 2023 proceedings and the 2024 proceedings. Nothing, however, allows even for a plausible argument that any such changes support a conclusion that respondent is no longer an SVP.

¶ 50    We note first that Louck Davis's diagnoses of respondent were unchanged from the previous reexamination report: UPD and OSPD, with the same specific personality disorders underlying each diagnosis as in 2023. Second, her assessment of respondent's level of risk was all but unchanged—and the change was for the worse. Respondent was still rated as at "High" risk on the same six SVR-20 factors as in 2023 and "Moderate" risk on the same three factors as in 2023. Also, Louck Davis continued to assess him at an above average risk to reoffend. The

only difference was that his level of risk was rated "increased" on two factors, "specifically[,] Sexual Health Problems and Negative Attitudes Toward Supervision." As for protective factors, Louck Davis found, as she did in 2023, that none applied.

¶ 51 To be sure, some changes reflected in Louck Davis's 2024 report appear somewhat favorable to respondent's argument that he was no longer an SVP. Specifically, Louck Davis acknowledged respondent's continuing improvements as to his OSPD in the areas of identity disturbance, impulsivity, deceitfulness, and odd behavior. However, Louck Davis noted no improvement with respect to respondent's UPD. Moreover, the improvements in several aspects of the traits underlying the diagnosis of OSPD scarcely implied that respondent had overcome his mental disorders or reduced his risk of reoffending. Indeed, some facts cut against respondent. Louck Davis reported that respondent spent much of his therapy discussing his gender identity and had thus delayed his progress in taking responsibility for his acts. More important, in both therapy and his interview with Louck Davis, respondent stated that he did not need therapy (and Louck Davis also noted that respondent supported others' anti-treatment beliefs). These repeated sentiments were not indicative of progress toward overcoming the mental disorders or reducing the risks that Louck Davis had found in her 2023 report.

¶ 52 Given that the touchstone of the probable cause hearing was the difference between the circumstances set out in the 2023 report—which we are obligated to accept for purposes of our review—and the circumstances set out in the 2024 report, we must affirm the trial court's conclusion that respondent did not establish his right to an evidentiary hearing on whether he was still an SVP.

¶ 53                                III. CONCLUSION

¶ 54 For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 55    Affirmed.